## No. 15,785.

INGWERSEN MANUFACTURING COMPANY *v*. MADDOCKS.
(195 P. [2d] 730)

Decided June 1, 1948.

Mr. Philip Hornbein, Mr. Philip Hornbein, Jr., Mr. Richard E. Bishop, for plaintiff in error.

Mr. Benjamin Griffith, Mr. Archibald A. Lee, for defendant in error.

*In Department.*

Mr. Justice Alter delivered the opinion of the court.

Arthur Maddocks, defendant in error, to whom we hereinafter refer as plaintiff, brought an action against Ingwersen Manufacturing Company, a corporation, as defendant, plaintiff in error here, to recover judgment in the sum of $20,000 together with interest, alleging said amount to be due him under a contract of employment. Upon trial to a jury, a verdict in favor of plaintiff in the sum of $6,055.18 was returned, and, after the overruling of a motion for new trial, judgment was entered in his favor, to review which defendant has sued out a writ of error.

The allegations of the complaint necessary for an understanding of the litigation are that, on or about December 1, 1939, plaintiff proposed that he enter into defendant's service as superintendent and take active charge of its business "for a salary of $30 per week, and plaintiff was to receive in addition for his said services

a bonus of 5% of the annual net profits of the business in cash and 10% of said net profits in corporate stock of the defendant corporation, all payable annually." It is further alleged that defendant accepted the proposal, and plaintiff continued in the discharge of his duties as superintendent until on or about August 2, 1944. Further, that plaintiff devoted his entire time and energies to defendant's business, resulting in an increase thereof to a highly prosperous condition, and in all other respects plaintiff fully performed all duties required of him as said superintendent. Further, it is alleged that for the year 1940 plaintiff received a cash bonus of $40, and for the year 1941 a cash bonus of $400, but that he never received any bonuses thereafter; that defendant made large sums of money in net profits during plaintiff's employment, and, although plaintiff repeatedly demanded the bonuses due him, the same have never been paid, to his damage in the sum of $20,000, for which sum, together with interest, he demanded judgment.

In the answer plaintiff's employment at a salary of $30 a week and a cash bonus of five per cent for the period of one year is admitted, but with the understanding that said bonus might be continued longer at the option of defendant. The allegation that plaintiff was to receive a bonus of ten per cent of the net profits of the company or any part thereof in corporate stock is denied. While it is admitted that a bonus of $40 and a bonus of $400 were paid plaintiff, defendant alleges that on or about April 23, 1942, plaintiff was informed that the corporation would pay no further bonuses, but that plaintiff's salary would be increased from $30 to $40 per week, and to this plaintiff agreed. Defendant further alleges that in addition to the salaries and bonuses admittedly paid plaintiff, he was paid a sum in excess of $2,800 for overtime, computed on a record which he had secretly kept for two years. There is a general denial of all other allegations of the complaint.

According to plaintiff's testimony, he first talked to

Ingwersen, the president and general manager of defendant, about employment early in the year 1939, at which time there was some discussion about his being employed to take care of the boilers at defendant's manufacturing plant; also some mention was made of a wage of $18 to $20 a week, which did not interest plaintiff, and he so informed defendant. In the fall of 1939 plaintiff, who had been engaged in the automobile business and whose lease of the premises he occupied was about to expire, again contacted Ingwersen and informed him of the prospective cancellation of his lease, and also that he was about to divorce his wife. There was a discussion of employment, but none of wages. At a later date, in a conversation with reference to wages, plaintiff informed Ingwersen that he had been making $40 to $50 a week, and Ingwersen told him that he would not be able to pay such a wage, stating that defendant corporation was not particularly prosperous and that it had not earned sufficient to pay him a monthly salary of $200. Some time later, and about the 1st of December, 1939, plaintiff proposed that he would go to work for the company at $30 a week, provided there was some bonus arrangement made with him, and he proposed that he receive $30 per week, a bonus of five per cent of the net earnings in cash, and ten per cent in stock. It appears that this proposition was taken under consideration by defendant; that, according to plaintiff, it ultimately was accepted; and that he began his employment thereunder on or about the 1st of December, 1939. At the time of the arrangement for plaintiff's employment, it was agreed that the bonus would be computed at about the 15th of March of each year. Plaintiff was introduced to the employees of the company and assumed general superintendency of its manufacturing plant, with plastics as its product. Plaintiff testified that, pursuant to his employment, he eventually was able to effectuate economies in production; that by his supervision of employees and discharging those who were inefficient, pro-

duction was greatly increased, and earnings became correspondingly greater. In addition to his duties at defendant's factory, plaintiff testified that he was called upon to, and did, assist defendant in connection with some of its financial matters. Some time subsequent to his employment, plaintiff became a director in the defendant corporation, when one qualifying share of stock was issued to him. He testified further that in connection with his employment he usually commenced work at about 6:30 o'clock A. M., and continued until 10 P. M., and sometimes until 2 A. M., on the following day. It further appears that he made some arrangement for the use of his own automobile in connection with the company's business. Sometime in April, 1942, Ingwersen, as president and general manager of defendant, presented plaintiff with a $400 check, stating that it was the bonus check for 1941. Plaintiff thereupon asked about the bonus check for 1940, to which reply was made that it was about $40, and that this amount would be paid later. Plaintiff testified that he demurred to this arrangement, and stated that the bonus check was not sufficient and that thereupon he was referred to the company's auditor for verification of the amount due under his employment. He testified that the auditor, although requested several times to do so, never explained to him the financial condition of the company upon which the 1940 and 1941 bonus check amounts were computed, and, as a matter of fact, no explanation thereof was ever given him for any of the years of his employment. Plaintiff further testified that in April, 1942, when the 1941 bonus check was handed to him, he was notified that his weekly compensation was increased from $30 to $40 per week, retroactive to January 1, 1942. At this time, when his weekly wage was increased, no mention was made of any bonus arrangement, although plaintiff testified that he subsequently referred to the matter and that on one occasion subsequent to April, 1942, Ingwersen stated to him that his bonus arrangement of five per cent of the

net profits and ten per cent in stock would, in the course of five or ten years, put him on "easy street." On subsequent occasions plaintiff complained concerning the auditor's failure to disclose the basis upon which the 1940 and 1941 bonus amounts were computed, and Ingwersen stated that he would probably be able to get the auditor to satisfactorily explain matters to him; however, such explanation was never forthcoming. When plaintiff was discharged in August, 1944, he inquired about his bonus checks, and Ingwersen then disclaimed any liability of the company therefor.

On June 30, 1942, plaintiff was called into defendant's office and presented with the minutes of a director's meeting of that date by which the salary of Ingwersen was, on motion, increased from $200 a month to $2,000, and he was requested, as a director to approve the minutes by his written signature thereto, which request he refused, stating that there had been no such meeting, and that he had not participated in any meeting as indicated by the minutes. He then stated that if Ingwersen's salary was increased to $2,000 per month there would be no profits for the company, and, consequently, no bonuses, to which Ingwersen replied, "Well, whether you want it or not, that's the way it is going to be." The record shows the minutes purportedly were signed by the five directors, plaintiff's name appearing on the second line, but plaintiff definitely stated that he did not sign the minutes; that the signature thereto was not his, nor was it authorized by him.

Plaintiff, with the knowledge and approval of defendant, used business cards upon which defendant's name appeared, together with: "Arthur Maddocks, Superintendent, Telephone Pearl 7963."

On cross-examination plaintiff testified that he was wholly unfamiliar with the plastic business at the time he began his employment with defendant, and that after some discussion with Ingwersen his weekly wage and bonus arrangement was entirely satisfactory to the lat-

ter as defendant's president and general manager; further that there was no mention made of the duration of his contract; that he might discontinue his employment when he pleased, and that defendant might discharge him if and when it saw fit to do so; further that he did not " punch a time clock," and when asked his reason therefor stated, "Why, I was never asked to. We figured I was an executive, and it is not customary for an executive to punch a time clock." He did not "punch a time clock" until February 15, 1944, when he was requested to do so by a representative of the Wage and Hour Division who had called and checked defendant's employees' records. Plaintiff identified an exhibit referred to as "Receipt for unpaid wages as Computed or Approved by the Wage and Hour division under the Fair Labor Standards Act of 1938," which disclosed that he had receipted for the sum of $2,814.84 paid him by defendant, which sum was based upon a daily record of the hours which he had worked for defendant corporation beginning with the week ending January 3, 1942, and ending with February 29, 1944.

From questions propounded to, and answers thereto by, the plaintiff in a deposition, it is reasonable to assume that subsequent to his "punching" the time clock in February, 1944, any overtime to which he was entitled was regularly paid him. With reference to the conversation between plaintiff and defendant's general manager in April, 1942, when plaintiff's salary was increased, effective January 1, 1942, the record reveals the following:

"Q. Didn't he tell you [plaintiff] at that time that from then on there would be an increase in the salary and bonus arrangement would end? A. He did not. Q. He never told you that at any time? A. He never told me that the bonus was discontinued, or any other new arrangement was made. He did tell me I had an increase, an increase in salary, because he thought he could afford paying it to me now. Q. But nothing was

said about the bonus? A. Nothing was said about it at that or at any time, when I asked him about the bonus a couple of years after that. Q. That is the time when you commenced to keep overtime? A. I had been keeping overtime for several months before that."

With reference to overtime payment, plaintiff testified: "Q. Now, the fact is that you did not make any claim for overtime; you didn't think you had it coming, did you? A. I thought I had a different arrangement altogether than overtime. Q. With overtime? A. Without overtime. I had a bonus arrangement from the start of my employment. * * * Q. Did you make any claim for overtime? To the government? A. I did not. Q. Didn't you give the government the figures? A. After the government's demand for those figures. Q. So the fact is you didn't want any overtime? A. I didn't think that I had any overtime coming. Q. That's right. Why didn't you think you didn't have overtime coming? A. Because I had a bonus arrangement. Q. So then you didn't think you had both coming, did you? A. No, sir. Q. Isn't it a fact that you started to keep this record in '42, the hours that you put in, so that you would know your overtime? Is that right? A. That is correct. Q. And you knew so far as the bonus is concerned the question of overtime did not make any difference? A. That was not my point in keeping track of the time I put in. * * * Q. You didn't think that you were entitled to both the bonus and overtime? [No answer.]"

It appears that the trial was begun on May 22, 1946; that two days prior thereto plaintiff's deposition was taken, and at the trial plaintiff, at defendant's counsel's request, read into the record therefrom as follows: "Q. And when you kept your record of the overtime, you didn't do that in connection with any claim to a bonus? A. Yes, I did that for my own information. Q. You did that for your own information? I am asking you whether you kept that record, that private record, so that you could collect a bonus or you would know

what the amount of the bonus was? A. No, that wasn't it at all, but I wanted to be sure, if I was working on a bonus down there, that it would be as satisfactory as the overtime, and if that wasn't as satisfactory I would insist under the bonus system that I would go back under the hourly rate basis. Q. So, then, the fact is that you wanted to figure which was the best— A. I wanted to know which one was the best, and that is the one I was going to take. * * * Q. So, the fact is that all the time you were keeping this record you didn't know whether you were under the bonus system or on the overtime system? A. Oh, yes, I did. Q. You knew you were under the bonus system? A. That's right. Q. But you did know that this record would not be of any use to you so far as a bonus is concerned? A. That's correct. Q. The bonus had to do with efficient production? A. That's correct."

Plaintiff was then asked, and he answered: "Q. You could repudiate the bonus system if there were no profits and go on the hourly rate, and if there were profits then you would claim your percentage of the profits and not take the hourly wage, but you don't think you are entitled to both, do you? A. I was entitled to what the law entitled me to."

On redirect examination the witness was asked: "Q. Now, will you state to the jury just why you kept the records of those hours and what was your intention in so doing? A. Well, I was paid a bonus of $400, and also of $40, which constituted for '40 and '41, and when I stopped to figure that out that didn't give me an increase in pay of a dollar a day. At that time, why, I was making $30 a week working six days, which would be $5 a day. Well, I didn't think I could afford to keep wasting my time for less than $6 a day because I could make more money than that, but I was willing to go along as long as the business was on the upgrade under the bonus system, with the intention the next time the bonus was paid, why, if it wasn't any more satisfactory than that,

than it had been in the past, that I could quit the job. I didn't want to stay there if I wasn't going to make any money. Q. The bonus arrangement was one which was terminable at will by either you or Mr. Ingwersen, is that correct? A. That is correct. Q. You say you kept track of the records to find out whether you were making enough money to justify you in going ahead? A. That is correct."

About June 30, 1942, as we have said, defendant's president presented plaintiff with the minute book of the corporation in which there were recorded minutes of a meeting of the board of directors increasing the salary of defendant's president and general manager from $200 to $2,000 per month, at which time, according to plaintiff, the following occurred: "Q. Tell the jury, now, just what he said to you and what you said to him about that? A. Well, he evidently came in the front door of the office as I came in in the rear. I just came back from lunch. He said, 'Oh, Mack, I want to see you a minute.' And so he said, 'Come in this office here.' So I went in the office with him. He partially closed the door and he said, 'I was just down to Bishop's office and got these minutes.' * * * A. Yes. He said, 'I got some minutes here for you to sign.' So I said, 'All right. Let's see them.' And he handed me the minutes, reached in his inside pocket and took out a fountain pen and commenced to hand me that. I commenced to read the minutes. I saw exactly what it said. Q. What did the minutes say? A. Well, it said that there had been a meeting of the board of directors of the company. Q. What did it say about his [the president and general manager] raise in salary? A. It said a motion had been made to raise his salary from $200 to $2,000 a month. Q. All right. A. And that I had seconded the motion. Q. Did the resolution say that? A. It did. Q. All right. Now, what happened after that between you and Mr. Ingwersen? A. I said, 'Mr. Ingwersen, there wasn't any meeting of any board of directors at which I seconded any

motion for a raise in salary from $200 to $2,000 a month. Consequently, I'm not going to sign those minutes.' I said, 'You'd have to have a regular meeting before I would do anything like that.' I says, 'And then I wouldn't second the motion because if you get $2,000 a month salary there wouldn't be any profits, and in that way if there was no profits you couldn't pay me a bonus. What would I be working for?' Q. What did he say? A. He said, 'Well, whether you want it or not, that's the way it is going to be.'"

It would appear that the Wage and Hour Division, under the Fair Labor Standards Act, prepared a receipt for unpaid wages under date of June 9, 1944, which was about fifty days before plaintiff was discharged. An exhibit discloses that plaintiff had a record of his hours worked beginning January 3, 1942, and ending on the 29th day of February, 1944, and this was the basis upon which his unpaid wages were computed by the Wage and Hour Division. The exhibit clearly indicates that plaintiff's wages so computed were based on $40 per week, which, it will be remembered, became effective January 1, 1942. From the time record it was found that plaintiff was entitled to $2,814.84 which, according to the receipt, was "unpaid wages computed or approved by the Wage and Hour Division under the provisions of the Fair Labor Standards Act of 1938 and covering period or periods of employment December 4, 1939, to February 29, 1944." The receipt was signed by plaintiff.

As we have said, plaintiff, with defendant's knowledge and consent, had printed cards of the company upon which he was designated as superintendent, and it also appears from the record that until the Wage and Hour Division suggested otherwise, plaintiff considered himself an executive or administrative employee, and he asserts that the only reason he did not qualify under this classification was the fact that he was receiving less than $200 per month.

A certified public accountant testified that he had

made an examination of the books and records of the defendant corporation, and, as a result of such examination found that during the years 1940 to 1943, inclusive, and from January 1, 1944, to July 31, 1944, the net profits of the corporation were $61,676.28, with the salary of its president and general manager computed on the basis of $200 monthly, and that fifteen per cent of this sum with interest computed thereon, amounting to a total of $10,615.18, was plaintiff's interest in the net profits, assuming he had a contract of employment entitling him to a weekly wage and a five per cent cash and ten per cent stock (reduced to cash percentage) bonus arrangement. This witness further testified that he had also computed the net profits of the corporation for the period of time mentioned upon the basis that the general manager was receiving a salary of $2,000 per month after July 1, 1942. As a result of this computation, the witness stated that the net profits of the corporation amounted to $16,877.30, and, computing the bonus as was done heretofore, the amount due thereunder would be $2,091.60.

There are five specifications of points, but two of which we deem of sufficient importance to merit discussion. These are: 1. The contemporaneous construction of the contract of employment by plaintiff; and 2. the increase of the president and general manager's salary on June 30, 1942, with the knowledge of the plaintiff, from $200 per month to $2,000 per month.

■ 1. It is alleged in the complaint, and plaintiff testified, that he was to give his entire time and energy to defendant's business "for a salary of $30 per week, and plaintiff was to receive in addition for his said services a bonus of five per cent of the annual net profits of the business in cash and ten per cent of said net profits in corporate stock of the defendant corporation, all payable annually." Plaintiff further testified that his employment was terminable at will and that he knew that he was not entitled to both the bonus and payment for

overtime. He admitted the payment of a bonus check in the sum of $400 in April, 1942, at which time he was informed by defendant's general manager that his wages would be increased to $40 per week retroactive to January 1, 1942, and he testified that no mention whatever was made of the continuance or discontinuance of the bonus arrangement. It is significant that plaintiff did keep a record of his overtime for the week ending January 3, 1942, and thereafter until the 29th day of February, 1944, after which he testified defendant paid him time and a half overtime in accordance with the provisions of the wage and hour law. Plaintiff testified that subsequent to April, 1942, when he received his $400 check, which appears as an exhibit in the record and bears an endorsement thereon "account salary," on several occasions he had inquired of the general manager and auditor about the bonus payment to him, but without securing information regarding the same. While the auditor testified definitely that no inquiry about the bonus was ever made of him, and the general manager positively stated that the only times subsequent to April, 1942, that any bonus was mentioned was a bonus for all of his employees, not for the plaintiff alone, and in nowise connected with the original contract of employment. Subsequent to April, 1942, until plaintiff was discharged, the record discloses no specific demand by plaintiff on defendant for the payment of any bonus, cash or otherwise.

On June 9, 1944, the Wage and Hour Division under the Fair Labor Standards Act of 1938, computed the overtime payments due plaintiff from defendant, and in this computation fixed his weekly earnings on the basis of a dollar per hour or $40 for a work week provided by the Act, by this method arriving at the sum of $2,814.84 due plaintiff.

Plaintiff testified in substance that he was the superintendent of defendant corporation, but, because he received a salary of less than $200 a month, the Wage and

Hour Division insisted that he was not an executive or administrative employee under the provisions of the Act, and, therefore, the defendant must pay him overtime. He furnished his overtime record and receipted for the amount due. The receipt which plaintiff signed was a "Receipt for Unpaid Wages" and "working period or periods of employment December 4, 1939, to February 29, 1944." If defendant was entitled, as he testified, to a bonus of five per cent in cash and ten per cent in stock, in addition to his salary of $40 per week, it is obvious that between January 3, 1942, and February 29, 1944, he was receiving in excess of $200 per month, and would, according to his testimony, have been properly classified as an administrative or executive officer of the corporation and therefore not within the provisions of the wage and hour law. It must be assumed that the $40 per week or one dollar per hour used by the Wage and Hour Division was reported as the basis of wages or compensation by plaintiff or, if it was information obtained from the records of defendant corporation, certainly the computation was approved by plaintiff, and he accepted and retained the benefits thereof.

On September 2, 1941, there was an interpretive bulletin or statement issued by the Wage and Hour Division with reference to bonuses, dividing the same into two categories, Wage and Hour Release No. R-1548 and R-1458 (a), September 2, 1941. In the first category the payment or the amount of the bonuses was solely in the discretion of the employer. The sum of the bonuses was determinable by him, and there were no contractural rights, express or implied, entering into the employment. The second category included those bonuses which were not payable in the discretion of the employer but which were based on contractural rights, express or implied, growing out of an employment. This category includes the bonus arrangement based upon the employer's promise, agreement or arrangement with his employee to pay it, and the amount of the bonus so to be paid may be

definitely fixed or definitely ascertainable by use of some formula. Illustrative of the bonuses of this category, the interpretative bulletin or statement reads:

"Other kinds of bonuses falling within this group are bonuses distributed in a certain amount or on the basis of a fixed percentage of the profits of the employer or of his gross or net income. There are many variations and refinements of plans within this category. For example, the amount of the payment may vary according to the length of service of the employee, his production or compensation; the earnings, production or compensation of the group of employees with which he works; the sales or net or gross income of the employer, or it may be contingent upon his continuing in the employ of the employer until the time the payment is to be made.

"Bonus payments of this type will be considered a part of the regular rate at which an employee is employed, *and must be included in computing his regular hourly rate of pay and overtime compensation.* No difficulty arises in computing overtime compensation if the bonus covers only one pay period. Under the bonus plan, however, calculation of the bonus may necessarily be deferred over a period of time longer than a workweek. In such a case the employer may disregard the bonus in computing the regular hourly rate until such time as the amount of the bonus can be ascertained. Until that is done he may pay compensation for overtime at one and one-half times the compensation paid the employee, exclusive of the bonus. When the amount can be ascertained, it must be apportioned back over the workweeks of the period during which it may be said to have been earned. The employee must then receive an additional amount of compensation for each week that he worked overtime during the period equal to one-half the hourly rate of pay allocable to the bonus for that week multiplied by the number of overtime hours worked during the week. If it is impossible to allocate the bonus among the workweeks of the period in proportion to the amount

of the bonus actually earned each week, some other reasonable and equitable method of allocation must be adopted. * * * " (Italics ours)

This method of ascertaining the rate of overtime pay due an employee where a bonus is involved has been approved by the Supreme Court of the United States as well as United States Courts of Appeals. *Walling, etc. v. Youngerman-Reynolds Hardware Co.*, 325 U. S. 419, 65 Sup. Ct. 1242, 89 L. Ed. 1705; *Walling, etc. v. Harnischfeger Corp.*, 325 U. S. 427, 65 Sup. Ct. 1426, 89 L. Ed. 1711; *Walling, etc. v. Richman Screw Anchor Co., Inc.*, 154 F. (2d) 780; *Walling, etc. v. Gurlock Packing Co.*, 159 F. (2d) 44; *Walling, etc. v. Wall Wire Products Co.*, 161 F. (2d) 470; *Walling, etc. v. Frank Adam Electric Co.*, 163 F. (2d) 277; *Rollin Electrical Co. v. Black*, 163 F. (2d) 417.

From plaintiff's testimony it appears that if, during the period of his employment with defendant he had been receiving a monthly salary of $200 or more, he would have been classified either as an administrative or executive employee, and, therefore, not within the provisions of the Act. According to the testimony of the certified public accountant called by plaintiff as his witness, the net profits arising out of the business operations of defendant in which plaintiff was employed were:

| | |
|---|---|
| 1940 | $ 2,210.14 |
| 1941 | 4,196.82 |
| 1942 | 14,226.25 |
| 1943 | 24,466.51 |
| 1944 to July 31 | 16,576.56 |

The net profits from July 1, 1942, and subsequent years to July 31, 1944, are based upon a salary of $200 per month to the general manager rather than $2,000 per month as fixed in the minutes of the board of directors on June 30, 1942. According to plaintiff's evidence, if his wages were as he testified, $40 per week, and in addition thereto the bonus arrangement, under

the interpretative bulletin or statement mentioned, he would have received far in excess of the salary requirement to make him an executive employee, and during all his subsequent employment, as stated in his evidence, he qualified as an executive or administrative employee. It is presumed that the officers and employees of the Wage and Hour Division were familiar with the interpretative bulletins and statements issued by that division and that they were faithful in the discharge of their duties and in the protection of employees engaged in the production of goods for commerce. As we have said, plaintiff's contract of employment and the wages he was to receive therefor must have been furnished by plaintiff himself or obtained from the books and records of defendant. In any event, plaintiff received and retained the amount found to be due him from his employer for overtime work based upon a construction of his contract of employment. Plaintiff himself testified that he kept his hourly record for the purpose of determining whether it would be more advantageous to him to continue under the bonus system or under the provisions of the Wage and Hour Act. His receipt and retention of the sum of $2,814.48 computed upon his daily record of hours worked, amounts to a contemporaneous construction of his contract of employment with the consent and approval of the Wage and Hour Division from January 1, 1942, until February 29, 1944, and, as he himself testified that he was not entitled to both bonus and overtime pay, by accepting and retaining the amount calculated to be due him by the Wage and Hour Division without a reservation of any kind whatever and without explanation thereof, definitely and finally precludes him from now recovering under any bonus arrangement made in December, 1939, assuming that such was made. The contemporaneous construction of this contract of employment, admitted by plaintiff and acquiesced by defendant, is too conclusive to admit of doubt.

2. It is plaintiff's contention that the minutes of

the meeting of the board of directors on June 30, 1942, were never signed by him and that the compensation paid defendant's general manager at the time his contract of employment was executed could not be increased. It will be observed that plaintiff's weekly wage was increased prior to any increase in defendant's general manager's salary, and this increase to plaintiff occasions no objection by him. According to his testimony, when he refused to sign and approve the minutes of the meeting of the board of directors, which, according to the record, was held on June 30, 1942, and protested to defendant's general manager any increase in his salary, he was definitely and positively told, as he testified: "Well, whether you want it or not, that's the way it is going to be." The board of directors of defendant corporation consisted of five members, and the record shows unquestionably that four of them signed and approved the increase of salary to plaintiff. From his testimony it appears that plaintiff entered into a contract of employment terminable at will. His signature and approval of the minutes was entirely unnecessary to make it a valid action of the board of directors, and when he was informed that the salary of the general manager would be increased whether he approved or not, it was optional with plaintiff to continue in his employment or not, as his business judgment dictated. He elected to continue, and, even assuming that he was otherwise entitled to a bonus arrangement with an employment terminable at will, his interest in the bonus was not such as to entitle him to have wages and salaries of other employees and business expenses frozen at the rate for which they were paid at the time of his employment and his bonus arrangement. To hold otherwise would confer upon plaintiff limitless power and authority in connection with the corporate business affairs. The members of the board of directors, or a majority thereof, by virtue of their office, are vested with the authority to control the business affairs of the corporation. Ordinarily this

control cannot be challenged by any person other than a stockholder injuriously affected by some action of the board, and the present suit does not come within that category.

Our disposition of the action makes it unnecessary for us to discuss other specifications.

The judgment is reversed and the cause remanded to the district court with instructions to dismiss the action.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE HILLIARD concur.