565 P.2d 217 (1977)
Suzanne M. GOOD, Individually and as parent, next friend and natural guardian of her minor children, Terry E. Good, Sandra K. Good and Kelly Jo Good, on their behalf, Plaintiffs-Appellees,
v.
A. B. CHANCE CO., a corporation, Pitman Manufacturing Co., a corporation, Elder Equipment Leasing, Inc., a corporation, and Elder Trailer and Body, Inc., a corporation, Defendants-Appellants.
No. 74-551.
Colorado Court of Appeals, Div. I.
March 3, 1977.
Rehearing Denied March 24, 1977.
Certiorari Denied May 31, 1977.
*220 Carrigan & Bragg, P. C., Jim R. Carrigan, Boulder, for plaintiffs-appellees.
Wood, Ris & Hames, Eugene S. Hames, Denver, for defendants-appellants A. B. Chance Co. and Pitman Mfg. Co.
Long & Jaudon, James A. Dierker, Joseph C. Jaudon, Jr., Denver, for defendants-appellants Elder Equipment Leasing, Inc., and Elder Trailer and Body, Inc.
KELLY, Judge.
A. B. Chance Co. and Pitman Manufacturing Co., a division of Chance, appeal a judgment finding them liable to Suzanne Good and her three children for damages for the wrongful death of Robert Good, their husband and father, respectively. Chance also appeals the adverse judgment on a cross-claim of Elder Equipment Leasing, Inc., and Elder Trailer and Body, Inc., retailers for Pitman.
Good, an electrical lineman for Hamlin Company, was electrocuted while working in the basket of an aerial boom device, the "Pitman Hotstik," designed and manufactured by Pitman. The accident occurred when current from an energized line passed or arced through a brass bonding screw on the lower face of the Hotstik boom, then through a concealed metal braid running to the metal control mechanism in the basket, and through Good's body to a grounded line.
The complaint, based on products liability, alleged the inherently dangerous design of the Pitman Hotstik. In addition to its denials, Chance asserted the affirmative defenses of contributory negligence and "assumption of the risk." Elder answered, and cross-claimed against Chance for strict liability in tort.
Chance's numerous assignments of error may be grouped into four major divisions: (1) Those relating to the plaintiffs' motion in limine and the rulings of the trial court thereon; (2) those relating to the admission, exclusion and sufficiency of evidence of liability; (3) the admission and exclusion of evidence on damages issues and the amount of the damages; and (4) the propriety of the directed verdict in favor of Elder on its cross-claim against Chance. We treat these *221 divisions in this order and conclude that the judgment must be affirmed.

I. THE MOTION IN LIMINE[1]
Prior to the commencement of trial, the court entertained lengthy argument and testimony on the plaintiffs' motion in limine to exclude evidence of contributory negligence or assumption of the risk. Chance contends that this procedure resulted in numerous reversible errors. We do not agree.
We have previously approved the use of motions and orders in limine to forestall introduction of potentially prejudicial evidence until the court has ruled on its admissibility outside the presence of the jury. Bruckman v. Pena, 29 Colo.App. 357, 487 P.2d 566 (1971). Other states have also recognized the efficacy and importance of a procedure which restrains parties from referring to prejudicial matters of questionable legal relevance prior to a decision regarding admissibility.[2]
Specific statutes are not required to authorize a motion in limine. The underlying power of the trial court to pass on the admissibility of evidence is inherent, see Bruckman v. Pena, supra; Burrus v. Silhavy, supra note 2, and is reflected in the rules governing trial procedure. See, e.g., C.R.C.P. 16(a) and C.R.C.P. 43.
A motion in limine allows the trial court to consider the exclusion of evidence which may be logically, but not legally, relevant. See Dickson v. Bober, supra note 2; Davis, The Motion in Limine A Neglected Trial Technique, supra note 2. Because a motion in limine shortens trial, simplifies issues, and reduces the possibility of mistrial, its function is not unlike the pre-trial conference, and it may accomplish similar ends. See C.R.C.P. 16(a)(8); Wagner v. Larson, 257 Iowa 1202, 136 N.W.2d 312 (1965). Nevertheless, the procedures to resolve questions of the admissibility of evidence, and the determinations themselves, are subject to review.
The plaintiffs, by their motion, sought to shield the jury from evidence which would have prejudiced their case, but which lacked a legal basis for admission. Chance contends that the trial court erred in reviewing evidence supportive of its affirmative defenses at the hearing on the motion in limine, and also that the court's rulings on the admissibility of the evidence, during the hearing, were improper and resulted in an erroneous ruling on the motion itself.
Here, the purpose of the motion and the nature of the affirmative defenses asserted by Chance rendered an evidentiary hearing on the in limine issues essential to an informed ruling on the questions presented. Only after hearing the evidence could the trial court determine whether a proper foundation existed and whether the evidence was legally relevant.
This becomes more apparent in view of Chance's specific arguments. Initially, Chance argues that when the trial court granted the motion in limine it improperly excluded evidence that Good failed to use rubber gloves and line covers contrary to industry practice and Hamlin's safety rules. This evidence, which might otherwise have come before the jury related, at least in part, to Good's asserted negligence. Insofar as the evidence was excluded for this purpose, the ruling was proper. Kinard v. Coats Co., Inc., Colo.App., 553 P.2d 835 *222 (1976). Reception of or reference to such evidence during trial clearly would have been prejudicial to the plaintiffs' case.
Chance also asserted the affirmative defense of "assumption of the risk." Again it was necessary that the trial court determine Chance's evidentiary foundation for such a defense and ascertain its relevance, lest reference before the jury to legally inadequate and fatally prejudicial evidence result in a mistrial.
An affirmative defense in a products liability case exists when it can be shown that the injured party knew of the dangerous defect in the product and voluntarily and unreasonably encountered the known danger it presented. Hiigel v. General Motors Corp., Colo., 544 P.2d 983 (1976); Restatement (Second) of Torts § 402A, Comment n. The Comment n defense focuses on the subjective knowledge of the injured party, Pust v. Union Supply Co., Colo.App., 561 P.2d 355 (1976), and the burden of establishing the elements of this defense is on the party asserting it. Hiigel v. General Motors Corp., supra. Absent evidence of Good's subjective knowledge of the specific defect, and the danger it posed, Chance's evidence in support of the defense would have supported conjectural inferences only. Dolan v. Mitchell, 179 Colo. 359, 502 P.2d 72 (1972).
During the evidentiary hearing on the plaintiffs' motion in limine, Chance offered in support of its Comment n defense evidence of a Hotstik sales demonstration and of a movie shown during training sessions for users. However, unless Chance could show, by way of foundation, that Good saw the movie or attended the sales demonstration and that they included information about the product defects, such as the connection between the brass bonding screws and the metal controls in the basket, this evidence was irrelevant to the defense. Similarly, without a showing of Good's knowledge of the defects, evidence of his failure to use rubber gloves or protective line covers would have no bearing on the Comment n defense.
Accordingly, the trial court properly required Chance to supply the requisite foundation evidence. In no other way could it determine the propriety of this highly prejudicial evidence. See Bridges v. City of Richardson, supra note 2; C.R.C.P. 43(e); Comment, Motion in Limine, 29 Ark.L.Rev. 215 (1975).
Nevertheless, Chance argues that it would have been able to establish a foundation for this evidence but for the erroneous admission of evidence during the hearing. To rebut Chance's contention that Good was present at the Hotstik sales demonstration, the plaintiffs offered testimony of Good's crew leader and time cards for the day in question, which showed that Good's crew spent the entire day on a job site, and was not at the demonstration. While Chance is correct that these cards, and the writings contained thereon, were hearsay, they were nonetheless admissible under recognized exceptions to the hearsay rule.
The crew leader testified to the procedures for making entries on the time cards and to their subsequent use by the City of Longmont, Good's then employer. The cards, as records kept in the regular course of business, were admissible. Empire Diesel, Inc. v. Brown, 146 Colo. 477, 361 P.2d 964 (1961). The record also supports their admission as a recorded past recollection of the witness, Jordan v. People, 151 Colo. 133, 376 P.2d 699 (1962), cert. denied, 373 U.S. 944, 83 S.Ct. 1553, 10 L.Ed.2d 699 (1963), and their use to refresh the witness's memory. Mingo v. People, 171 Colo. 474, 468 P.2d 849 (1970).
Chance also complains of the trial court's exclusion of the Hotstik parts manual and the training movie. However, although the parts manual movie explain the proper methods for operating the Hotstik, they make no reference to the inherently dangerous nature of the product, and were therefore properly excluded. Hiigel v. General Motors Corp., supra.
While the trial court properly concluded that Chance did not lay a sufficient foundation at the evidentiary hearing for *223 its Comment n defense, Chance asserts that it was deprived of the opportunity to establish such a foundation later, during the course of the trial, because the order was not expressly made conditional by the court until the trial had been in progress for several days. However, the record does not show that Chance was prejudiced by the clarification of the order. The plaintiffs offered to re-subpoena any witness whose recall was requested by Chance for the purpose of cross-examination, if Chance so desired, but Chance did not request the recall of any of the plaintiffs' witnesses and offered no additional evidence in support of its defense.
In view of the conclusions we have reached on these issues, it follows that the trial court properly rejected Chance's tendered instruction on the Comment n defense. See O'Brien v. Wallace, 145 Colo. 291, 359 P.2d 1029 (1961); Culp v. Rexnord & Booth-Rouse Equipment Co., Colo., 553 P.2d 844 (1976).

II. EVIDENCE RELATING TO LIABILITY
Chance also objects to the trial court's admission at trial of its preliminary drawing of a warning decal prepared prior to Good's accident, and to the admission of evidence showing that a decal based on the drawing was distributed to users of the Hotstik after the accident. Chance contends that, since there was no showing that the decal itself was available for distribution before the accident, the preliminary drawing was irrelevant to liability. Chance further argues that explanations for the delay in its distribution of the decal to users were precluded by the prior exclusionary rulings of the trial court in its order on the motion in limine.
The testimony showed that a decal based on the preliminary drawing could have been supplied over a year prior to Good's death. This evidence tended to show a breach of Chance's duty to warn, and, was therefore relevant to the issue of liability. See Hiigel v. General Motors Corp., supra. Hiigel held that a failure to warn may render a product defective when that failure is a proximate cause of the injury. See also, Hamilton v. Hardy, Colo. App., 549 P.2d 1099 (1976); Pust v. Union Supply Co., supra. The evidence demonstrated pre-existing knowledge of the danger inherent in the product, the feasibility of giving a warning, and established a duty to warn users of the defect. Evidence of pre-accident remedial measures is admissible for these purposes. See doCanto v. Ametek, Inc., 328 N.E.2d 873 (Mass. 1975).
Chance argues that the order in limine deprived it of the right to explain that its failure to obtain and distribute the warning decals resulted from its belief that users of the Hotstik would wear rubber gloves and take other precautionary measures. Chance did not raise this issue at trial, and the argument here is directed to the weight, not to the admissibility, of the evidence of delay in obtaining the warning decal. Chance's explanation of the reasons for delay in distribution are not, in any event, sufficient to discharge its duty to warn nor does it prevent that duty from arising. Chance failed to make an offer of proof, and we are unable to determine what benefit could have been derived from the use of such evidence. See Rhodig v. Cummings, 160 Colo. 499, 418 P.2d 521 (1966); American National Bank v. Quad Construction, Inc., 31 Colo.App. 373, 504 P.2d 1113 (1972).
Exhibits showing subsequent design changes in the Hotstik were, according to Chance, improperly admitted. Specifically, Chance objects to the admission of a warning decal developed from the drawings previously admitted, to the admission of two photographs showing the decal in place over the brass bonding screws, and to the admission of other exhibits showing that Chance had in fact distributed warning decals to its dealers and users, including Elder and Good's employer, Hamlin. Chance's argument rests on the general negligence rule which precludes the use of evidence of post-accident curative measures to establish a defendant's negligence. See Burr v. Green *224 Bros. Sheet Metal, Inc., 159 Colo. 25, 409 P.2d 511 (1966); Barnes v. Safeway Stores, Inc., 30 Colo.App. 281, 493 P.2d 687 (1971).
While negligence principles are not applicable in a products liability case, see Hiigel v. General Motors Corp., supra, the question of subsequent design changes in the products liability context was addressed directly in Ault v. International Harvester Co., 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974). The court there distinguished the policy considerations involved in applying the negligence rule saying:
"The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. . . .
[N]ot only is the policy of encouraging repairs and improvements of doubtful validity in an action for strict liability since it is in the economic self interest of a manufacturer to improve and repair defective products, but . . . the application of the rule would be contrary to the public policy of encouraging the distributor of mass-produced goods to market safer products."
We agree with this analysis. See also Sutkowski v. Universal Marion Corp., 5 Ill. App.3d 313, 281 N.E.2d 749 (1972).
Here, the evidence to which Chance has objected tended to establish Chance's knowledge of the defect in its product, the feasibility of giving a warning, Chance's duty to warn, and its breach of that duty. Sterner v. U. S. Plywood-Champion Paper, Inc., 519 F.2d 1352 (8th Cir. 1975). Because failure to warn, where there is a duty to do so, may be considered a defect in the product itself, the plaintiffs' evidence of post-accident warnings had a direct bearing on the liability issue. See Sutkowski v. Universal Marion Corp., supra; doCanto v. Ametek, Inc., supra.
Chance next asserts error in the exclusion of the record of Good's admission to the Air Force Academy Hospital shortly after the accident. We agree that hospital records are ordinarily admissible under C.R.C.P. 43(a). Powell v. Brady, 30 Colo.App. 406, 496 P.2d 328 (1972). However, the admission of such records requires that they be relevant to the issues.
Here, the only possible significance of the hospital record was a statement, received by the admitting physician and recorded by the attending physician, that the injury occurred when Good fell across a hot line. Since it was uncontroverted that no one saw the accident happen, and no other evidence in the record indicates that Good fell across a hot line, it is difficult to perceive how this hearsay evidence was relevant to the issues, or how its exclusion was prejudicial.
Chance also argues that the testimony of the plaintiffs' expert witness, Hanna, was without proper foundation and was based on facts not in evidence. The record does not support this position. Two prior witnesses testified that the condition of the Hotstik examined by Hanna had not changed since the time of the accident, except for the addition of warning decals. Abundant independent evidence in the record on the cause of the accident also supported Hanna's opinion testimony.
As to the contention that inconsistent hypothetical questions were propounded to Hanna, we need only note that the two hypothetical questions addressed alternative ways in which the accident could have occurred. If the questions were inconsistent, this would affect the weight to be given the testimony, not its admissibility. See Dolan v. Mitchell, supra; Yeager Garden Acres, Inc. v. Summit Construction Co., 32 Colo.App. 242, 513 P.2d 458 (1973).
The trial court did not err in refusing to dismiss the Goods' complaint at *225 the conclusion of their evidence, and in denying Chance's motion for a directed verdict at the close of all the evidence. In our view, the Goods presented a case meriting jury consideration. Russell v. Wheeler, 165 Colo. 296, 439 P.2d 43 (1968). Similarly, no evidence in the record would justify direction of a verdict for the defendants. Romero v. Denver & Rio Grande Western Ry., 183 Colo. 32, 514 P.2d 626 (1973).
We have carefully reviewed Chance's remaining contentions which, if meritorious, would require reversal of the judgment of liability. As to each, we conclude that the rulings of the trial court were correct, were not prejudicial, or were discretionary and no abuse has been shown.

III. DAMAGES
Chance also asserts numerous errors in the admission and exclusion of testimony and exhibits relating to damages, contending that the trial court improperly admitted expert testimony based on hearsay and facts not in evidence and that the expert's opinion was improperly based on inflationary trends affecting Good's anticipated future earnings. Error is also assigned to the ruling prohibiting Chance from cross-examining the Goods' economic expert on the effect of income taxes on future earnings. Finally, Chance argues that the award was manifestly and grossly excessive, pointing with particularity to the allegedly improper admission of numerous exhibits tending to inflame the passions of the jury.
The plaintiffs' economist based his testimony on charts he prepared from statistics contained in official publications of various agencies of the United States government, including the Department of Commerce, the Department of Labor, and the Federal Reserve Board. Since these publications were not offered into evidence, Chance asserts that the expert's testimony was based on hearsay, see Brayman v. National State Bank, 180 Colo. 304, 505 P.2d 11 (1973); Denver v. Quick, 108 Colo. Ill, 113 P.2d 999 (1941), and on facts not in evidence. See Liber v. Flor, 160 Colo. 7, 415 P.2d 332 (1966); Wall v. Weaver, 145 Colo. 337, 358 P.2d 1009 (1961). We do not agree.
An exception to the hearsay rule is warranted where the proffered evidence is trustworthy, as here, and necessity compels its admission. See United States v. Aluminum Co. of America, 35 F.Supp. 820 (S.D.N.Y.1940); 6 J. Wigmore, Evidence §§ 1691, 1692 (3d ed.). The time spans encompassed by these statistics were lengthy, and the sources from which they were gathered are numerous and broad-based, making direct testimony from persons with first-hand knowledge of the writings from which the figures were extracted, a practical impossibility. See United States v. Mortimer, 118 F.2d 266 (2nd Cir. 1941); United States v. Aluminum Co. of America, supra. In addition, such information, even if obtainable, could not possibly have enlightened or assisted the jury in weighing the expert's testimony. See C.R.C.P. 43(g)(5).
The expert witness's qualifications as an expert were not challenged, and the charts referred specifically to the government publications from which the expert obtained his statistics. The economist testified that he routinely relied on figures contained in official publications of various agencies of the United States government. In today's society, anyone professionally engaged in evaluating or predicting future economic conditions must rely on official reports of governmental agencies. Hence, the trial court's admission of the charts and testimony based thereon was tantamount to its taking judicial notice of the accuracy of these official publications, and was, therefore, proper. See Ingwersen Mfg. Co. v. Maddocks, 118 Colo. 281, 195 P.2d 730 (1948); Mitchell v. Jones, 104 Colo. 62, 88 P.2d 557 (1939); see also Proposed Colorado Rules of Evidence, Third Draft, Rule 803(8); Federal Rules of Evidence, Rule 803(8); Uniform Rules of Evidence, Rule 803(8); cf. Pust v. Union Supply Co., supra.
Chance further argues that the trial court erred in permitting the economist to project a six percent annual increase in wages during the decedent's work expectancy and to address inflationary factors *226 affecting damages, contending that this testimony was speculative. Chance construes the net pecuniary loss rule too narrowly, and has misinterpreted the economist's testimony on inflation in light of that rule.
It is settled that net pecuniary loss is the proper measure of damages in a wrongful death action under § 13-21-203, C.R.S.1973. Lewis v. Great Western Distributing Co., 168 Colo. 424, 451 P.2d 754 (1969). However, such damages necessarily include estimations of the accumulations of a decedent during the probable remainder of his life. Denver, South Park & Pacific Ry. v. Woodward, 4 Colo. 1 (1877); Colo. J.I. 10:3.
It is true that the economist projected a six percent annual increase in wages during Good's work expectancy. However, he also projected inflationary factors during the same period of time, and deducted these figures from the projected wage increases. The economist then discounted these adjusted future earnings to present value, and Chance does not contend otherwise.
Chance also urges that it was improperly precluded from cross-examining the economist on prospective federal and state income taxes on earnings during the projected remainder of Good's working life. Chance asserts that such evidence should have been admitted to establish net pecuniary loss.
Unless the restriction of cross-examination constitutes a denial thereof, the extent of cross-examination is ordinarily a matter within the sound discretion of the trial court. See Carsell v. Edwards, 165 Colo. 335, 439 P.2d 33 (1968). Here, we find no abuse of that discretion.
During cross-examination of the plaintiffs' expert, Chance sought to elicit a simple answer from the expert that income taxes had not been considered in his compilation of figures. The expert was not permitted to answer. Chance did not show that the witness had information upon which to base an opinion on the effect of income taxes and made no offer of proof on the projected tax burden.
Under these circumstances, the trial court did not err in refusing to permit Chance's general inquiry about the effect of income taxes on anticipated future earnings. See Rhodig v. Cummings, supra; Baldwin v. Schipper, 155 Colo. 197, 393 P.2d 363 (1964); Hiigel v. General Motors Corp., 34 Colo.App. 145, 525 P.2d 1198 (1974), reversed on other grounds, Hiigel v. General Motors Corp., supra.
The exhibits showing Good's civic activities and correspondence school achievements were not, as Chance contends, irrelevant to the issue of net pecuniary loss. On the contrary, they tended to show that Good was an ambitious man, and inclined to improve his family's station in life. Indeed, these exhibits buttress the testimony of the plaintiffs' economist that Good would probably receive future wage increases.
There is no merit to the argument that the jury award was manifestly and grossly excessive simply because it exceeded by approximately $44,000, the amount of pecuniary loss projected by plaintiff's economist. Here, the economist's testimony showed that his figures were conservative, and the jury was not required to adhere strictly to the expert's testimony. Mooney v. Van Kleeck Mortgage Co., 79 Colo. 252, 245 P. 348 (1926).
Chance's contention that pictures of the decedent taken with his wife and with his children should not have been admitted in evidence is not persuasive. In a less complex case, the admission of such exhibits might have occasioned jury consideration of factors not properly related to net pecuniary loss. Here, however, there were but four exhibits among over 50 submitted to the jury after a trial of some three weeks' duration. The evidence was received without comment by the court or by counsel, and no mention was made of them during summation to the jury. The burden rests with Chance to show wherein these exhibits were prejudicial, and no such showing has been made. See Hadden v. *227 Gateway Co., 130 Colo. 73, 273 P.2d 733 (1954). Accordingly, their admission was not reversible error.
Ample evidence in the record supports the jury award. Since this evidence was uncontroverted, the trial court properly denied that part of the motion for new trial based on the size of the verdict. See Parker v. Plympton, 85 Colo. 87, 273 P. 1030 (1928).

IV. DIRECTED VERDICT ON THE CROSS-CLAIM
Finally, Chance argues that the trial court erred in directing a verdict for Elder on its cross-claim against Chance for indemnity, and in submitting verdict forms to the jury consistent with its instructions on this aspect of the case. Chance supports this position by arguing that since it had no direct contact with Good's employer, Elder "was under a duty to instruct Hamlin and its employees as to the proper operation of the device." Accordingly, Chance asserts, the jury could have returned a verdict against Elder, while exonerating Chance.
To the extent that this argument rests on the assertion that privity of contract is relevant to recovery in a products liability case, the rationale was rejected in Bradford v. Bendix-Westinghouse Automotive Air Brake Co., 33 Colo.App. 99, 517 P.2d 406 (1973). If, on the other hand, the argument is premised on Elder's purported duty to instruct Hamlin and its employees on the proper methods of operating the Hotstik, it still must fail. We have already noted the holding in Hiigel v. General Motors Corp., supra, that a product may be considered defective because of the failure to comply with the duty to warn. This duty is not discharged by directions which explain the manner of operating the product, but which do not specifically identify the dangers inherent in deviating from those directions.
We need not, and do not, consider whether a manufacturer's duty to warn is delegable to others in the chain of distribution of a product. Even assuming delegability, there is no evidence in this record that Chance supplied Elder with any directions on the proper use of the Hotstik which advised Elder of the specific dangers inherent in not following those directions. Hence, it was Chance's failure to warn, not Elder's, which proximately caused the injury, and there was no basis in the evidence for a verdict against Elder.
Nevertheless, Chance argues that imposition on a manufacturer of strict liability to others in the chain of distribution is improper as a matter of law. We disagree. The policy considerations underlying strict liability in tort justify "the relief of indemnity against persons in the distributive chain who have placed a product in the stream of commerce with the knowledge of its intended use." Texaco, Inc. v. McGrew Lumber Co., 117 Ill.App.2d 351, 254 N.E.2d 584, 588 (1969).
"It is not unusual for liability to move transactionally up the chain of distribution until the manufacturer ultimately pays for its breach . . . to the distributor to whom it initially sold the goods." Kelly v. Hanscom Brothers, Inc., 231 Pa.Super. 357, 331 A.2d 737, 740 (1974).
Under the facts disclosed here, the instruction given by the trial court was correct, and it properly directed a verdict in favor of Elder on the cross-claim. See CeBuzz, Inc. v. Sniderman, 171 Colo. 246, 466 P.2d 457 (1970).
Judgment affirmed.
COYTE and STERNBERG, JJ., concur.
NOTES
[1] Literally, "at the threshold." For the sake of clarity, the term "in limine" should be restricted to evidentiary rulings and motions made immediately prior to commencement of trial, as opposed to objections to admissibility made during trial and argued to the court in camera.
[2] See, e. g., Sacramento & San Joaquin Drainage District v. Reed, 215 Cal.App.2d 60, 29 Cal.Rptr. 847 (1963), remittitur amended, 217 Cal.App.2d 611, 31 Cal.Rptr. 754 (1963); Burrus v. Silhavy, 155 Ind.App. 558, 293 N.E.2d 794 (1973); Mead v. Scott, 256 Iowa 1285, 130 N.W.2d 641 (1964); Dickson v. Bober, 269 Minn. 334, 130 N.W.2d 526 (1964); Cook v. Philadelphia Transportation Co., 414 Pa. 154, 199 A.2d 446 (1964); Bridges v. City of Richardson, 163 Tex. 292, 354 S.W.2d 366 (1962); see also Comment, Motion in Limine, 29 Ark.L. Rev. 215 (1975); T. Davis, Trial Technique § 7:09; Davis, The Motion in Limine  A Neglected Trial Technique, 5 Washburn L.J. 232 (1966).