**No. C-1174**

**The Union Supply Company, a Colorado corporation v. Larry E. Pust and Holly Sugar Corporation, a New York corporation**

(583 P.2d 276)

Decided August 14, 1978.

Yegge, Hall & Evans, John R. Trigg, Jeffrey B. Stalder, for petitioner.

Bragg & Dubofsky, P.C., Douglas E. Bragg, for respondents.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

Certiorari was granted to review the decision of the court of appeals in *Pust v. Union Supply Co.*, 38 Colo. App. 435, 561 P.2d 355. We affirm the judgment of the court of appeals.

This products liability case involves the doctrine of strict liability in tort, as applied to design defects and to a failure to warn. We also address the question whether strict liability and implied warranty can be extended to component part manufacturers. It is our conclusion that liability can be so extended in certain situations.

Plaintiff Larry E. Pust was injured on October 31, 1968, when his right arm was caught in the "nip point" of a conveyor at the Holly Sugar Corporation plant in Sidney, Montana. He was working in the wet pulp area of this sugar beet refining plant, and his principal activity was to keep the conveyor belts free from pulp so that they would not slip on their rollers. As he was cleaning off the pulp with a rod, somehow his hand was caught in the "nip point" and his arm was pulled in. As a consequence of this industrial accident, his right arm and part of his right shoulder had to be amputated.

Pust received approximately $25,000 in workmen's compensation benefits from Holly Sugar under the Montana Workmen's Compensation Act. Since Montana's act, like Colorado's, is an exclusive remedy statute, Holly Sugar was thereby immunized from "any other liability whatsoever" for the injury. Section 92-203, R.C.M. 1947.

Pust filed a medical malpractice action in Montana against the physician and the hospital who had treated his injury. He charged negligence in

permitting gas gangrene to develop in his arm and shoulder, eventually necessitating their amputation. This action was settled before trial. Pust received $67,000 and signed an "Agreement and Covenant Not to Sue Further," limited to the physician and hospital.

In 1971, Pust filed this products liability case against the Union Supply Company in Denver District Court. The complaint alleged that Union Supply had designed and manufactured the conveyor in the Holly Sugar plant, that the conveyor was defective, and that it was the proximate cause of Pust's injuries. Union Supply responded by joining Holly Sugar as a third-party defendant, seeking indemnification for any liability that it might incur. However, the trial court dismissed this third-party action before trial. On separate appeal, we held, in *Holly Sugar Corp. v. Union Supply Co.*, 194 Colo. 316, 572 P.2d 148, that this dismissal was proper. This court ruled that Holly Sugar could not be held liable in such a common law indemnity action under either the Montana or the Colorado workmen's compensation law.

This case was tried before a jury on the theories of strict liability and implied warranty. Union Supply acknowledged that there were neither safety guards nor warnings at the site where Pust's injuries occurred. Pust presented expert testimony that the conveyor, which had no automatic cleaning device on the belt, was "defective" in that the "nip point" lacked safety guards, and no warning was given as to the hazards present at the "nip point." Neither the initial drawings by Holly Sugar nor the plans submitted by Union Supply provided for safety guards around the "nip point."

The bulk of the evidence was directed to the issue of exactly who was responsible for the design and manufacture of the conveyor. Holly Sugar had sent bid drawings, together with documents listing the various parts needed, to three conveyor suppliers, including the Union Supply Company. Union Supply was the low bidder and was awarded the contract. Union Supply then submitted its own drawings to Holly Sugar, substituting another manufacturer's components and allegedly adding mechanical engineering specifications necessary for manufacture.

Union Supply subcontracted out the manufacture of most of the component parts. It then shipped the conveyor in sections to Holly Sugar for on-site assembly. There was evidence that Union Supply redesigned and modified each of the sections of the conveyor. Some of these modifications were contained in a final manufacturing or assembly drawing sent by Union Supply to Holly Sugar. At the installation site, Holly Sugar added the following parts: a motor, conveyor belt, electrical controls, legs for support, stairs and walkways, and the counterweight.

At the close of all the evidence, the district court granted Union Supply's motion to dismiss the complaint. On appeal, the court of appeals reversed the judgment dismissing Pust's complaint, and held that jury

questions had been presented on the issues of strict liability and implied warranty. *Pust v. Union Supply Co., supra.* Union Supply cross-appealed from the dismissal of its third-party complaint against Holly Sugar. As already discussed, we separately resolved that issue in Holly Sugar's favor in *Holly Sugar Corp. v. Union Supply Co., supra.* Union Supply also cross-appealed several of the trial court's evidentiary rulings, but the court of appeals affirmed the trial court on these issues.

■ At the outset, we agree with the court of appeals that the trial court should have submitted the strict liability and implied warranty causes of action to the jury. As often stated, a trial judge should only invade the fact-finding function of the jury in the clearest cases when the facts are not in dispute. *Romero v. Denver & Rio Grande Western Railway Co.,* 183 Colo. 32, 514 P.2d 626; *Gossard v. Watson,* 122 Colo. 271, 221 P.2d 353. The opinion of *Nettrour v. J. C. Penney Co., Inc.,* 146 Colo. 150, 360 P.2d 964, contains the classic formulation of the standard a trial court must use in considering a motion for a directed verdict:

"In passing upon a motion for a directed verdict the trial court must view the evidence in the light most favorable to the party against whom the motion is directed. Every reasonable inference to be drawn from the evidence presented is to be considered in the light most favorable to such party. A motion for directed verdict can only be granted where the evidence, when so considered, compels the conclusion that the minds of reasonable men could not be in disagreement and that no evidence, or legitimate inference arising therefrom, has been received or shown upon which a jury's verdict against the moving party could be sustained. * * *"

There were many questions of fact critical to the determination of the ultimate issues involved in this case which should have been left for resolution by the jury. We now consider those matters in relation to the issues presented in this case.

## I. RECOVERY BASED ON STRICT LIABILITY

■ In *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983, this court expressly adopted the doctrine of strict liability in tort, based on the *Restatement (Second) of Torts* § 402A. Pust's strict liability claims were for: (1) design defects in the conveyor; and (2) failure to adequately warn of the hazards of working at the "nip point" of the conveyor.[1]

---

[1] We note that there are three general areas of the manufacturing process that lead to strict liability claims. These areas have been characterized as follows: (1) *physical flaws* due to improper manufacture; (2) inadequacies in *design*; and (3) inadequate *warnings* concerning the hazards or proper methods for safe use. *Montgomery & Owen, Reflections on the Theory and Administration of Strict Tort Liability for Defective Products,* 27 So. Caro. L. Rev. 803, 811 (1976).

## A. *Design Defects*

■ This court has heretofore never had the occasion to decide whether a defect in the design of a product can form the basis of a claim in strict liability. The Colorado Court of Appeals declared, in *Bradford v. Bendix-Westinghouse Automobile Air Brake Co.*, 33 Colo. App. 99, 517 P.2d 406, that § 402A is available in Colorado as a theory of recovery for design defects. We agree and now hold that if a product is unreasonably dangerous because of a defect in its design strict liability may lie.[2]

We perceive no valid reason not to extend strict liability to design defects. A defective product may be equally hazardous to the ultimate user or consumer whether its defect arises from a flaw in manufacture or from a flaw in design. We observe that if a defect is in the design of a complete product line it is potentially dangerous to many more people than a physical flaw in one product would be. A defect in design may be more difficult to legally establish than a defect in manufacture, but courts and juries constantly wrestle with similar problems of proof in other areas of the law. *See Twerski et al., The Use and Abuse of Warnings in Products Liability — Design Defect Litigation Comes of Age*, 61 Cornell L. Rev. 495 (1976).

Pust argues that this conveyor was defective in design for failure to attach safety guards and for failure to provide an automatic cleaning device. A number of cases have specifically held that the failure to provide safety devices can be the basis of a §402A design defect case. *E.g., Pike v. Frank G. Hough Co.*, 2 Cal. 3d 465, 467 P.2d 229, 85 Cal. Rptr. 629; *Wright v. Massey-Harris, Inc.*, 68 Ill. App. 2d 70, 215 N.E.2d 465.

■ Pust further contends that Union Supply may be held strictly liable both as a designer and as a manufacturer of the component parts of a defectively designed conveyor system. We agree that each of these questions should have been submitted to the jury for its determination.

## B. *Liability of a Designer*

■ Looking at the evidence in the light most favorable to Pust, we find ample evidence that Union Supply was a designer of this conveyor system. There was evidence that Union Supply added the mechanical and structural design, together with the necessary engineering specifications, without which the conveyor could not be built. Other evidence showed that

---

[2] One early case predicating strict liability on a defect in design was the landmark case of *Greenman v. Yuba Power Products, Inc.*, 59 Cal. 2d 57, 377 P.2d 697, 27 Cal. Rptr. 97. Legal commentators almost unanimously agree that strict liability should be based on defects in design. *E.g.*, 2 L. Frumer & Friedman, *Products Liability* 16A[4][f][iv]; *W. Prosser, Torts* § 99 (4th ed. 1971); 63 *Am. Jur. 2d Products Liability* § 130. *Cf. Henderson, Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication*, 73 Colum. L. Rev. 1531 (1973). One well-reasoned recent decision which lists some of the many recent cases approving of strict design liability is *Seattle-First National Bank v. Tabert*, 86 Wash. 2d 145, 542 P.2d 774.

Union Supply redesigned and modified each of the sections of the conveyor. One expert testified that while Holly Sugar did the "performance design" — how much sugar beet pulp the conveyor would carry and how much power was needed — Union Supply did the "mechanical design" necessary for the conveyor to be operational. There was evidence that Union Supply had subcontractors do the component work and that Union Supply only charged Holly Sugar one price for the system. Based on this evidence, a jury could find Union Supply to be a designer of the conveyor.

We observe that in certain situations more than one party could be the designer of a product. Where two or more parties collaborate and where each substantially contributes to the final design, each is a designer of the final product. Design appears to involve: "that part of the manufacturing process requiring decisions as to general structure, shape, size, material, and methods or processes of construction." *Comment, Foreseeability in Product Design and Duty to Warn Cases— Distinctions and Misconceptions,* 1968 *Wis. L. Rev.* 228, at 231. It is conceivable that a jury could determine that both Holly Sugar and Union Supply were designers of the conveyor.[3] If Union Supply is found by the trier of fact to be a designer and if the other elements of a § 402A design defect case are established, then Union Supply will be strictly liable for Pust's injuries.

### C. *Liability as a Manufacturer of Component Parts*

Pust contends that even if Union Supply is not found to be a designer, it may still be held strictly liable as the manufacturer of the component parts of a defectively designed conveyor system. The court of appeals agreed with this agrument and specifically held: "* * * that a fabricator, who manufactures a product according to plans submitted by the ultimate user cannot avoid liability even if the design submitted is unsafe, provided it is feasible for him to install safety devices."

Although we do not embrace the expansive view of the court of appeals, we agree that the manufacturer of component parts may be held strictly liable in certain situations. We follow the majority view that a manufacturer of component parts may be held strictly liable for injuries to a consumer caused by design defects in the component parts when they are expected to and do reach the consumer without substantial change in condition. *Accord, Suvada v. White Motor Co.,* 32 Ill. 2d 612, 210 N.E.2d 182; *Burbage v. Boiler Engineering & Supply Co., Inc.,* 433 Pa. 319,

---

[3] It is settled law that joint tort-feasors are jointly and severally liable, and that the injured party can choose to sue only one of them. *W. Prosser, Torts,* § 47 (4th ed. 1971). We held in *Holly Sugar Corp. v. Union Supply Co.,* 194 Colo. 316, 572 P.2d 148, that if Union Supply is found liable here it has no right to contribution from Holly Sugar. However, we express no opinion on a joint tort-feasor's right of contribution in the products liability area when workmen's compensation laws are not involved.

249 A.2d 563. In *Hiigel v. General Motors Corp., supra,* it was suggested that the manufacturer of a component part that undergoes *no change* when incorporated into something larger can be liable in strict tort for defects in that part.[4] The present case reaches further because it involves alleged design defects in parts that may have undergone *some change* before reaching the consumer.

Our view of the scope of a strict liability case against a manufacturer of component parts is more circumscribed than that of the court of appeals. Thus, we review what we believe to be the proper elements of a strict liability cause of action based on design defects against a manufacturer of component parts.

 The first element is that component parts must be in a "defective condition unreasonably dangerous" to the user or consumer.[5] It will undoubtedly be difficult to decide whether a defect is in the design of certain component parts or in the design of the conveyor system as a whole. Unlike defects in manufacture — such as a defective tire assembly in an automobile or a defective fuse in a hand grenade — defects in design are not easily attributed to one component part or group of parts. *Cf. Nowakowski v. Hoppe Tire Co.,* 39 Ill. App. 155, 349 N.E.2d 578; *Foster v. Day & Zimmerman, Inc.,* 502 F.2d 867 (8th Cir.). Nonetheless, looking at the evidence in the light most favorable to the plaintiff here, a jury could find that there was a design defect, in not including safety guards at the "nip point" or in not attaching a cleaning device, in the conveyor sections manufactured by Union Supply.

The second element is that the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." *Restatement (Second) of Torts* § 402A(1)(b). When applied to this case, the question is whether the sections manufactured by Union Supply were expected to reach the user (Pust) and did so without

---

[4] This is in accord with comment q, *Restatement (Second) of Torts* § 402A, which states: "It is no doubt to be expected that where there is no change in the component part itself, but it is merely incorporated into something larger, the strict liability will be found to carry through to the ultimate user or consumer."

[5] We are fully aware of the split in authority on the definition of strict liability. Section 402A requires a plaintiff to prove that a product is in a "defective condition unreasonably dangerous to the user or consumer." Several courts have eliminated the "unreasonably dangerous" portion of this definition because it introduces negligence language into a strict liability cause of action. *E.g., Butaud v. Suburban Marine & Sporting Goods, Inc.,* _____ Alaska _____, 543 P.2d 209; *Cronin v. J. B. E. Olson Corp.,* 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433; *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893. This deletion of "unreasonably dangerous" has been extended to design defect cases. *Barker v. Lull Engineering Co., Inc.,* 20 Cal. 3d 413, 573 P.2d 443, 143 Cal. Rptr. 225. In Colorado, we have traditionally used the complete language from section 402A. *See Bradford v. Bendix-Westinghouse Automotive Air Brake Co.,* 33 Colo. App. 99, 517 P.2d 406; *Colorado Jury Instructions* 14:20 (1976 Supp.). We find that the "unreasonably dangerous" portion of the definition serves the useful function of placing some limits on the liability of a manufacturer or seller.

undergoing a substantial change in design.

The element of "without substantial change" has been strictly adhered to in most decisions that have held component part manufacturers strictly liable.[6] For example, in the landmark case of *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182, the Illinois Supreme Court held the manufacturer of a defective automobile brake system strictly liable, noting that the automobile assembler had made no substantial change in the system. Likewise, in *Burbage v. Boiler Engineering & Supply Co.*, 433 Pa. 319, 249 A.2d 563, a valve manufacturer was held strictly liable for injuries caused by the explosion of a boiler since the defective boiler valve did not undergo substantial change.

On the other hand, a few courts have occasionally excused a plaintiff from showing that a product was not expected to and did not undergo a substantial change in condition. *E.g., Bexiga v. Havir Manufacturing Corp.*, 60 N.J. 402, 290 A.2d 281. The authors of the Second Restatement expressed no opinion on this issue. Caveat (3) and comment q, *Restatement (Second) of Torts* § 402A. In our view, however, this element is important and a showing should be made that the defectively designed component parts were not expected to and did not undergo a substantial change after they left the manufacturer's hands. We emphasize, though, that the expected change in the parts must be substantial; small changes and minor processing will not relieve the component part manufacturer of liability. Of course, even substantial changes which do not affect a pre-existing design defect in parts do not absolve the manufacturer of liability.

The third element is that the design defect must be the cause of the plaintiff's injury. Union Supply does not dispute that Pust received his injuries at the "nip point" of this conveyor. If it is shown that design defects in sections manufactured by Union Supply made the conveyor unreasonably dangerous at the "nip point" to Pust, then the element of causation had been shown.

Union Supply has argued that many conditions — such as Pust's knowledge of the risk, the patent nature of the danger at the "nip point," and a substantial change in the parts — were intervening causes of Pust's injury. Each of these conditions is more properly considered as a defense based on assumption of the risk.

Union Supply argues that it should be permitted to introduce evidence that it reasonably expected Holly Sugar to add safety guards, and that Holly's failure to do so constitutes an intervening cause. This evidence injects into the case the irrelevant negligence issue of who had

---

[6] An excellent discussion on the importance of retaining the "without substantial change" element in a § 402A case can be found in *Southwire Co. v. Beloit Eastern Corp.*, 370 F. Supp. 842 (E.D. Pa.) (see especially footnote 21).

the duty to install safety guards. In strict liability cases, we are not concerned with who had the duty to provide guards, but rather with whether the conveyor was in a defective condition unreasonably dangerous because of the failure to provide safety guards before it reached the ultimate user or consumer. *See Hiigel v. General Motors Corp., supra.*

The fourth element of the component part design strict liability case is that the defendant sold this product and is engaged in the business of selling such products. *Restatement (Second) of Torts* § 402A(1)(a).

The final element, of course, is that the plaintiff has sustained damages as a result.

### D. *Failure to Warn*

In the case of *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983, we held that: "* * * [A] failure to warn adequately can render a product, otherwise free of defect, defective for purposes of §402A.'' This defective condition is ''unreasonably dangerous'' to the user or consumer if the manufacturer does not give sufficient warnings of dangers inherent in the product or in its intended use in order to make it safe. *Crane v. Sears Roebuck & Co.,* 218 Cal. App. 2d 855, 32 Cal. Rptr. 754. *See also* comment j, *Restatement (Second) of Torts* § 402A.

Pust's claim for failure to adequately warn of dangers present at the "nip point" of the conveyor is based on the theory of strict liability, and not negligence. This is an important distinction to make, although the same evidence will frequently be used to show both. The court of appeals has aptly distinguished the two theories as follows:
"* * * Under strict liability, the test is whether the failure of * * * [the manufacturer] to adequately warn of the potentially dangerous propensities of its product rendered that product unreasonably dangerous. It is of no import whether this drug manufacturer's warning comported with the warning a reasonably prudent drug manufacturer would have given.'' *Hamilton v. Hardy,* 37 Colo. App. 375, 549 P.2d 1099.

Under the principles announced in *Hiigel v. General Motors Corp., supra,* we hold that a jury question was presented as to whether Union Supply should be liable on this theory.[7] It could certainly be found that a failure to attach warnings at the "nip point" created a "defective condition unreasonably dangerous" to the user or consumer. The other elements of a *failure to warn* strict liability claim are the same as those already discussed for strict liability based on design defect. This, of course, includes the extension of liability to a component part manufacturer.

---

[7] Unlike the plaintiff in *Hiigel,* there was no evidence that Pust received any warnings at all from Union Supply. Thus, we are not presented with an issue as to the adequacy of warnings.

### E. *Defenses to Strict Liability*

There has been some confusion in this case regarding the available defenses to a strict liability action. Since this case is being remanded for a retrial, we will briefly comment on what we perceive to be appropriate defenses.

Assumption of the risk as stated in § 402A is a defense to strict liability. *Hiigel v. General Motors Corp., supra.* In this contest, it is defined as: "voluntarily and unreasonably proceeding to encounter a known danger." Comment n, *Restatement (Second) of Torts* § 402A. More particularly, the defendant must demonstrate that the plaintiff had actual knowledge of the *specific danger* posed by the defect in manufacture or design, and not just a general knowledge that the machinery could be dangerous. *Culp v. Rexnord & Booth-Rouse Equipment Co.,* 38 Colo. App. 1, 553 P.2d 844.[8] The defendant has the burden of establishing this defense. *Luque v. McLean,* 8 Cal. 3d 136, 501 P.2d 1163, 104 Cal. Rptr. 443.

We stress that ordinary contributory negligence, consisting of failure to exercise due care to discover a defect or to guard against its possible existence, is not a defense to strict liability. Comment n, *Restatement (Second) of Torts* § 402A. Our view is in accord with the great weight of authority. *E.g., Cronin v. J.B.E. Olson Corp.,* 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433; *Shields v. Morton Chemical Co.,* 95 Idaho 674, 518 P.2d 857; *Deem v. Woodbine Manufacturing Co.,* 89 N.M. 50, 546 P.2d 1207. *Cf. Codling v. Paglia,* 32 N.Y.2d 330, 298 N.E.2d 622, 345 N.Y.S.2d 461.

Union Supply asserts that it can also use what has become known as the "open and obvious" defense. It argues that since the dangers of the conveyor were obvious to everyone no warning was necessary to alert intended users, and thus Union Supply cannot be liable for a failure to give a warning. *See Tomicich v. Western-Knapp Engineering Co.,* 292 F. Supp. 323 (D. Mont.), *aff'd,* 423 F.2d 410 (9th Cir.).

The apparent origin of the "open and obvious" rule was in the case of *Campo v. Scofield,* 301 N.Y. 468, 95 N.E.2d 802, which has been recently overruled in *Micallef v. Miehle Co., Inc.,* 39 N.Y.2d 376, 348 N.E.2d 571, 384 N.Y.S.2d 115. From its inception, it has been frequently attacked by courts and legal scholars. One commentator has perceptively argued that: "* * * [t]his [use of the 'open and obvious' defense] amounted to applying an assumption of the risk defense as a matter of law, with the added disadvantage that the defendant was relieved of the

---

[8] We approve the analysis of the court of appeals in this case that: "* * * [A] general knowledge of the danger of machinery with moving parts or a general awareness that if part of Pust's body were to become caught in the moving parts of the machinery and cause injury is insufficient to satisfy the requisites of this defense." *Pust v. Union Supply Co.,* 39 Colo. App. 435, 561 P.2d 355.

burden of proving that plaintiff had subjectively appreciated a known risk." *Rheingold, The Expanding Liability of the Product Supplier: A Primer,* 2 *Hofstra L. Rev.* 521, 541 (1974).

We hold that the alleged patent nature of a defect is not in and of itself a defense to strict liability. Simply because a hazard is "open and obvious" does not prevent it from being unreasonably dangerous to the user or consumer. Approval of the rule would be contrary to sound public policy. As the Washington Court of Appeals has commented: "* * *[T]he manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one. The law, we think, ought to discourage misdesign rather than encouraging it in its obvious form." *Palmer v. Massey-Ferguson, Inc.,* 3 Wash. App. 508, 476 P.2d 713.

## II. *RECOVERY BASED ON IMPLIED WARRANTY*

Pust made two claims against Union Supply based on implied warranty theory. He alleged that the conveyor system was not merchantable because it was not fit for the ordinary purposes for which it was used (section 4-2-314(2)(c), C.R.S. 1973), and also that it was not fit for the particular purpose for which it was required (section 4-2-315, C.R.S. 1973). Each of these claims presented issues of material fact which should have been submitted to the jury for resolution.

It is apparent that a defect in design may render a product unmerchantable or not fit for the particular purposes for which it was required. As in the strict liability area, implied warranty liability can extend to the manufacturer of component parts. *Accord, Putman v. Erie City Manufacturing Co.,* 338 F.2d 911 (5th Cir.); *Deveny v. Rheem Manufacturing Co.,* 319 F.2d 124 (2d Cir.); *Clark v. Bendix Corp.,* 42 App. Div. 2d 727 345 N.Y.S.2d 662; *cf. Goldberg v. Kollsman Instrument Corp.,* 12 N.Y.2d 432, 191 N.E.2d 81, 240 N.Y.S.2d 592. Nonetheless, we emphasize that the lack of fitness must be found in the component parts before they leave the component parts manufacturer, and not merely in the completed system.

## III. *EVIDENTIARY RULINGS*

Three evidentiary issues have been raised by the parties. They concern the admissibility of: (1) evidence of the settlement of Pust's medical malpractice lawsuit; (2) evidence of industry conveyor safety standards; and (3) evidence of bias of the Holly Sugar employees called by Pust. We affirm the rulings of the court of appeals and the trial court on each evidentiary issue.[9]

---

[9] Union Supply concedes that these evidentiary issues are governed by Colorado law. In general, the law of the forum state determines whether or not evidence is admissible. *See Restatement (Second) of Conflict of Laws* § 138; 29 *Am. Jur. 2d Evidence* § 6. On the three evidentiary issues presented here, we hold that the law of Colorado, the forum state, should be applied.

176

## A. *Settlement of Medical Malpractice Lawsuit*

■ Union Supply contends that the trial court erroneously excluded all evidence of the settlement of Pust's Montan lawsuit for medical malpractice against the treating physician and hospital. Union Supply sought to introduce copies of: (1) Pust's complaint in that action; (2) the Motion and Order for Dismissal; and (3) the Agreement and Covenant Not to Sue.[10] We hold that the trial court properly excluded this evidence.

In his complaint against the physician and hospital, Pust claimed: "* * * [t]hat as a direct and proximate result of the joint and concurring negligence of the Defendants, Plaintiff sustained the loss of his right arm above the shoulder. * * *" Apparently, Union Supply is contending that Pust originally claimed that the treating physician and hospital were the cause of his injuries, but now inconsistently asserts that Union Supply is the cause. First, these statements are not necessarily inconsistent because an injury can have many causes. Second, a plaintiff is permitted in his complaint to allege alternative and inconsistent claims for relief. C.R.C.P. 8(e). Thus, this evidence is inadmissible to impeach Pust on the basis of prior inconsistent allegation.

Contrary to Union Supply's argument, the settlement of the malpractice action is irrelevant to any other issue in the case. It is not relevant to *damages* because of a pretrial stipulation that any jury award to Pust would be reduced by the $67,000 he received in settlement of the malpractice lawsuit.

■ The evidence is also not relevant to the issue of *causation*. An original tort-feasor is liable for any additional injury suffered by a plaintiff due to the negligence of any person who renders aid reasonably required by the original injury. *Powell v. Brady,* 30 Colo. App. 406, 496 P.2d 328, *aff'd* (on another issue only), 181 Colo. 218, 508 P.2d 1254. *See Restatement (Second) of Torts* § 457.

## B. *Industry Safety Standards*

■ Union Supply argues that the trial court erred in permitting Pust to introduce parts of two sets of non-governmental conveyor safety codes. Safety Code B20.1 of the American Standards Association has been approved by the Conveyor Equipment Manufacturer's Association (CEMA) and the American Society of Mechanical Engineers (ASME). The National Safety Council Data Sheets 569 and 570 were drafted by an engineering committee of the National Safety Council, and have been approved by many groups, including CEMA and ASME. Thus, they are

---

[10] The Agreement and Covenant Not to Sue expressly covers only the physician and hospital. It expressly does not release Union Supply. In addition, the agreement specifies that the $67,000 received in settlement only partially satisfies the total damages suffered by Pust. Thus, we are not presented with the issue of whether this agreement also releases Union Supply.

consensus standards of safety for conveyor systems, approved by the conveyor manufacturers. They were in effect at the time of Pust's injury.

The trial court ruled that these standards were admissible on the issue of whether the conveyor was in a "defective condition unreasonably dangerous." The court specified that they were to be introduced by an expert witness and must be shown to be recognized standards of safety in the conveyor manufacturing field.

The principal objections raised by Union Supply to the use of the safety standards in this case are that they are irrelevant and that they are inadmissible hearsay. We note initially that the parts introduced from Safety Code B20.1 and Data Sheets 569 and 570 do *not* presume to assess who has the duty to provide safety features. Thus, they do not raise extraneous issues of negligence. *Cf. Murphy v. L & J Press Corp.,* 558 F.2d 407 (8th Cir.).

In our view, these safety standards are relevant, especially in design defect cases. In cases of defects in manufacture, the jury is frequently able to judge the defective item by comparing it to others similarly produced by the manufacturer. However, as the California Supreme Court noted: "* * * A design defect, by contrast, cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design." *Barker v. Lull Engineering Co., Inc.,* 20 Cal. 3d 413, 573 P.2d 443, 143 Cal. Rptr. 225. By reason of the nature of the case, the trier of fact is greatly dependent on expert evidence and industry standards in deciding whether a defect is present.

In the case of *Wallner v. Kitchens of Sara Lee, Inc.,* 419 F.2d 1028 (7th Cir.), an employee's hand was injured when it was caught in the unguarded moving parts of a conveyor. The trial court admitted a conveyor industry safety code into evidence on the strict liability cause of action because it was: "sufficiently relevant to the questions of the dangerousness of the conveyor when it left Thiele's manufacturing plant to make its admission proper."

Union Supply appropriately points out that these safety codes fit within the classical definition of hearsay as out-of-court statements being offered into evidence to prove the truth of the matter asserted therein. However, since these industry safety standards contain sufficient indicia of reliability, we hold that they may be introduced as substantive evidence.

These codes were formulated by groups of experts in the conveyor designing and manufacturing field, and were approved by many organizations. They are likely to be more probative than a single learned treatise or an expert opinion, as they represent the consensus of an entire industry. There is no motive for the formulators to falsify, and there is no danger that the standards will be subsequently altered or incorrectly remembered by a witness. Finally, since we require that the safety standards be

introduced through an expert witness, the adverse party will have a fair opportunity to cross-examine the expert on any inconsistencies, misrepresentations or other limitations of the standards. Given these guarantees of trustworthiness, we approve the admission of industry safety codes as substantive evidence on the strict liability issue of whether a product is in a "defective condition unreasonably dangerous." *Accord, Murphy v. L & J Press Corp.*, 558 F.2d 407 (8th Cir.); *Dorsey v. Yoder Co.*, 331 F. Supp. 753 (E.D. Pa.); *Price v. Buckingham Manufacturing Co., Inc.*, 110 N.J. Super. 462, 266 A.2d 140.

The trial court correctly ruled that these standards must be introduced through an expert and must be authenticated as reliable and bona fide industry-wide safety codes. This was carefully done here by the expert testimony of Dr. Youngdahl, who participated in the formulation of each of the standards. Finally, we require that sufficient advance notice of the intended use of such standards be given to the adverse party so that he will have sufficient time to prepare to meet the evidence.

### C. Bias of Holly Sugar Employees

During the presentation of his case, Pust called a number of Holly Sugar employees as witnesses. On cross-appeal, Pust contends that the trial court erred in refusing to allow him to impeach these witnesses by showing their bias against him.[11]

The trial court's ruling was undoubtedly correct. We have held that: "The rule in Colorado is clear that a party may not impeach the credibility of his own witness where surprise is not claimed." *Mora v. People,* 172 Colo 261, 472 P.2d 142. This rule is applicable to civil cases. *E.g., Myers v. Myers,* 151 Colo. 8, 375 P.2d 525. Although the element of surprise has been statutorily eliminated for some types of impeachment in criminal trials (section 16-10-201, C.R.S. 1973), it has not been also eliminated in civil cases. Since Holly Sugar cannot be a party to this lawsuit, the special impeachment rules of C.R.C.P. 43(b) are also inapplicable. Thus, since Pust could not demonstrate that he was surprised by the uncooperative attitude of the Holly Sugar employees, the trial court properly refused to allow him to impeach them by attempting to show bias.

### IV. CONCLUSION

In sum, we hold that this case should have been submitted to the jury on the strict liability and implied warranty causes of action. We affirm the judgment of the court of appeals.

---

[11] At the time of the trial, Holly Sugar's employees had a financial interest adverse to that of Pust. Although Holly Sugar had been dismissed as a third-party defendant, it was unclear whether an appellate court would rule that Holly Sugar was required to indemnify Union Supply if Union Supply was held liable. On separate appeal, we have held that Holly Sugar cannot be found liable to Union Supply. *Holly Sugar Corp. v. Union Supply Co.,* 194 Colo. 316, 572 P.2d 148. Now, Holly Sugar no longer has an adverse financial interest. Of course, the Holly Sugar employees may still be hostile or uncooperative for other reasons.

MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN do not participate.