Charles R. JACKSON and Alice L.
Jackson, Petitioners,

v.

HARSCO CORPORATION and Patent
Scaffolding Company, Respondents.

No. 82SC203.

Supreme Court of Colorado,
En Banc.

Nov. 29, 1983.

Rehearing Denied Jan. 9, 1984.

Peter Alan Shelley, Boulder, for petitioners.

Madden & Strate, P.C., William J. Madden, Wheat Ridge, for respondents.

ERICKSON, Chief Justice:

In an action for personal injuries, Charles R. and Alice L. Jackson assert that the trial court committed reversible error in admitting evidence of the failure of Charles R. Jackson (plaintiff) to use a safety device which was in issue in a products liability case. They also allege error in instructing the jury on the defenses of assumption of the risk and misuse.[1] The Court of Appeals affirmed. *Jackson v. Harsco Corp.,* 653 P.2d 407 (Colo.App.1982). We granted certiorari and now reverse and return this case to the Court of Appeals with directions to remand to the district court for a new trial.

### I.

On August 6, 1976, plaintiff was on an aluminum scaffold painting and was about four or five feet above the floor of the third floor rotunda at the Colorado State Capitol building. The scaffold had been manufactured by Patent Scaffolding Company. As the plaintiff was descending from the scaffold, one of the scaffold's tubular legs collapsed causing the plaintiff to be thrown against the rotunda railing and injured. The scaffold had been placed a short distance from the railing. Beyond the railing, and immediately behind plaintiff, there was a straight drop of approximately sixty to seventy feet.

The scaffold consists of two vertical seven foot high and twenty-nine inch wide ladder frames connected by an eight foot wooden working platform upon which the worker stands. Cross bars provide the support for the platform. The wooden platform can be placed on any level of the ladder frame. Scaffolding units, according to the testimony, were often placed on top of each other in order to work at higher levels. Threaded tubular legs are permanently attached to each vertical leg of the ladder frame. A caster assembly (wheel and brake) is bolted to each threaded tubular leg. Optional outriggers are available and may be attached by clamps to each side of the ladder frames. The purpose of the outriggers is to provide a larger base when one or more scaffolding units are placed on top of each other.

Plaintiff brought this action under *Restatement (Second) of Torts,* § 402A alleging that one of the scaffold's tubular legs

---

1. Plaintiff, Charles R. Jackson, contends also that the trial court erred in terminating plaintiff's cross-examination of an expert witness for the defense. Plaintiff asserts that the trial court committed reversible error in failing to order defendants to answer plaintiff's interrogatories relating to the facts and documents supporting a claim of misuse of the scaffold. At trial, Alice Jackson sought compensation for loss of consortium. Because we reverse on the issue of the trial court's giving of the assumption of the risk and misuse instructions, we need not reach plaintiff's other claims on appeal.

had collapsed because of defective design. The design defect specified was that the manufacturer, Patent Scaffolding Company, had not placed a dust cap on the top portion of each leg. The plaintiff claims that the caps prevent corrosive materials from entering the top of the leg and accumulating at its base, thereby resulting in premature corrosion and weakening of the leg.[2]

Defendants did not deny that the leg was corroded, but contended that corrosion did not cause the plaintiff's fall. The defendants asserted the plaintiff had tipped the scaffold, thus causing the scaffold's leg to break. In their view, the plaintiff, rather than the corroded leg, caused the fall. Defendants also contended that the proper use of the outriggers by the plaintiff would have prevented the injury.

At trial, plaintiff's expert witness testified that the scaffold design allowed corrosive materials to enter into and accumulate at the base of one of the scaffold's tubular legs. The uncontradicted evidence is that the scaffold did not have a plug or cap to prevent the accumulation of corrosive materials. Outriggers, an optional piece of safety equipment, were attached to the scaffold at the time of the accident, but had not been clamped tightly to the frame. Defendants presented evidence that the scaffold would not have collapsed if the outriggers had been secured properly to the scaffold frame.

Prior to trial, plaintiff filed a motion *in limine* seeking to prevent the defendants' introduction of evidence of plaintiff's contributory negligence under the defense theories of assumption of the risk and misuse.

The motion was argued on the first day of trial and denied. The trial court deferred ruling on the defense of assumption of the risk and misuse until the evidence was offered. Ultimately, evidence of plaintiff's conduct was admitted and instructions on assumption of the risk and misuse were given to the jury. The jury returned a general verdict for defendants.

The Court of Appeals affirmed, and held that the evidence presented by defendants was sufficient to raise jury questions as to whether the injured plaintiff voluntarily and unreasonably encountered a known danger and misused the product in a way not reasonably anticipated by the manufacturer. We disagree.

## II.

We adopted the doctrine of strict liability as stated in *Restatement (Second) of Torts*, § 402A.[3] *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975). Products liability under section 402A does not rest upon negligence principles, but rather is premised on the concept of enterprise liability for casting a defective product into the stream of commerce. *Kinard v. Coats Co., Inc.*, 37 Colo.App. 555, 553 P.2d 835 (1976); Klemme, *The Enterprise Liability Theory of Torts*, 47 U.Colo.L.Rev. 153 (1975). Thus, the focus is upon the nature of the product, and the consumer's reasonable expectations with regard to that product, rather than on the conduct either of the manufacturer or of the person injured because of the product. *Bradford v. Bendix-Westinghouse Automotive Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973). Strict liability is applicable to an otherwise properly manufactured product if its design ren-

---

**2.** The evidence is that defendants knew that the scaffold would be used around corrosive materials.

**3.** The *Restatement (Second) of Torts* § 402A provides in pertinent part:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with seller."

ders it unreasonably dangerous. *Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276 (1978).

### A.

■ Assumption of the risk as stated in section 402A is a defense to strict liability. *Union Supply Co. v. Pust, supra.* In strict liability cases, assumption of the risk is defined as: "voluntarily and unreasonably proceeding to encounter a known danger...." *See* Comment n, *Restatement (Second) of Torts,* § 402A (1965).[4] The defendant must demonstrate that the plaintiff had actual knowledge of the specific danger posed by the defect in design, and not just general knowledge that the product could be dangerous. *Culp v. Rexnord & Booth-Rouse Equipment Co.,* 38 Colo.App. 1, 553 P.2d 844 (1976). The Comment n defense focuses on the subjective knowledge of the injured party. *Good v. A.B. Chance Co.,* 39 Colo.App. 70, 565 P.2d 217 (1977). Ordinary contributory negligence, consisting of failure to exercise due care to discover a defect or to guard against its possible existence, is not a defense to strict liability. *Union Supply Co. v. Pust, supra; Good v. A.B. Chance Co., supra; Hiigel v. General Motors Corp., supra.* The burden of establishing the elements of this defense is on the party asserting it. *Union Supply Co. v. Pust, supra.*

Plaintiff alleges that there was insufficient evidence to support the trial court's instruction on assumption of the risk.

■ We agree with defendants that evidence of plaintiff's conduct was admissible as relevant to the claim of design defect in failing to provide a cap in manufacturing the scaffold. It is well established that the design defect must have proximately caused the injury asserted. *Kinard v. Coats Co., Inc., supra.* Since the focus in products liability cases is on whether a defective product caused a particular injury, and not on conduct, the analysis of the user's acts is appropriate. *Kinard v. Coats Co., Inc., supra.*

■ Evidence of plaintiff's conduct was, however, not sufficient to support defendants' allegation that plaintiff had actual knowledge of the precise defect in design and the danger posed by it. There is no evidence to support the view that plaintiff had actual knowledge that corrosive materials had entered the scaffold leg and had caused a drastic weakening of the leg which would cause it to collapse. While plaintiff testified to having knowledge that the scaffold could tip under certain circumstances, no evidence was presented indicating that plaintiff was aware that a slight tipping of the scaffold could bring about the snapping of the already weakened leg and the ultimate collapse of the scaffold frame.

In *Culp v. Rexnord & Booth-Rouse Equipment Co., supra,* the Colorado Court of Appeals dismissed a products liability defense similar to the one in this case. In that case, plaintiff was standing on the side of a mixer and striking it with a hammer to loosen accumulated debris. He then lost his footing and fell towards a moving drum. His arm was caught between the drum and the stationary hopper, and he was severely injured. On appeal, the defendant alleged that the trial court erred in refusing to submit defendant's tendered assumption of the risk instruction to the jury. The Court of Appeals affirmed, and held:

> "There was no evidence that Culp [the plaintiff] had knowledge of the specific dangers arising out of the precise defects asserted, or that he voluntarily and unreasonably proceeded to encounter those dangers despite his awareness of the defects.... The only testimony pertaining to Culp's knowledge regarding any dangers presented by the mixer was his admission of his awareness that working

**4.** Comment n provides in pertinent part:

"Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

around heavy machinery posed some degree of danger to him, and that he was aware that if part of his body got caught in the moving parts of the machinery, injury was likely. This testimony was insufficient to warrant the submission of the requested instruction. General knowledge of this sort will not bar an injured user of a defective product on the grounds of voluntary encountering of a known danger arising from the defect.... Rather, the evidence must show that the plaintiff had actual knowledge of the specific danger posed by the defect in manufacture or design, and not just a general knowledge that the machinery could be dangerous."

38 Colo.App. at 2–3, 553 P.2d at 845. Absent actual knowledge on the part of plaintiff that the leg was in a weakened condition due to corrosive materials, plaintiff did not voluntarily and unreasonably encounter a known danger. *Good v. A.B. Chance Co., supra.*

■ The jury could have found that plaintiff did not establish by a preponderance of the evidence each of the requisite elements under section 402A, in which case, the jury's general verdict would be proper. On the other hand, we cannot rule out the possibility that the jury's general verdict reflects its finding that plaintiff voluntarily and unreasonably proceeded to encounter a known danger arising from a design defect in defendants' scaffold which foreclosed recovery. There was, however, no evidence that plaintiff had actual knowledge of the specific dangers arising out of the precise defect asserted, or that he voluntarily and unreasonably proceeded to encounter those dangers despite his awareness of the defect. *Culp v. Rexnord & Booth-Rouse Equipment Co., supra.* Because there was insufficient evidence to support the assumption of the risk instruction, and it is impossible to determine the grounds upon which the jury based its general verdict, we reverse and remand for a new trial. *Mosher v. Schumm,* 114 Colo. 441, 166 P.2d 559 (1946).

### B.

■ Misuse by an injured party which cannot reasonably be anticipated by the manufacturer can be utilized as a defense in a products liability case by showing that the conduct of the user, and not the alleged defect in a product, actually caused the accident. *Kinard v. Coats Co., Inc., supra.* Section 402A recognizes a defense for the manufacturer where the user mishandles or misuses a product and thereby creates a dangerous condition. *Bradford v. Bendix-Westinghouse Automotive Air Brake Co., supra.* The usual situation in which the defense may be asserted is where the product is being used in a way other than that which was intended and which could not reasonably have been anticipated by the manufacturer. *Bradford v. Bendix-Westinghouse Automotive Air Brake Co., supra.*

The basis of defendants' misuse defense is that plaintiff misused the scaffold by failing to properly attach the outriggers, which, in defendants' view, would have prevented the scaffold's collapse. The inquiry is whether plaintiff's failure to properly utilize the outriggers constitutes a use of the scaffold in a way other than that which was intended and which could not have reasonably been anticipated by defendants.

The evidence is uncontroverted that the working level of the platform upon which plaintiff was standing was approximately four or five feet above the floor of the third floor rotunda and a short distance from the railing. At the time of the scaffold's collapse, plaintiff was using only one section of the scaffolding. Plaintiff testified that he knew that the scaffold could tip and that outriggers were used to prevent tipping. He also testified that he knew the scaffold was near the rotunda railing and that beyond the railing there was an immediate drop of sixty to seventy feet.

There was conflicting evidence as to whether outriggers were required where a single section of scaffolding is utilized. The foreman of the paint crew testified that outriggers were not required at the height at which plaintiff was working, but that he had instructed his paint crew to use the outriggers regardless of the height only because he feared that the Colorado Occupational Safety and Health Association might

inspect his crew that day without notice. Patent Scaffolding Company's vice president testified that outriggers were optional equipment because they were necessary only when more than one level of scaffolding was being used.[5]

Defendants introduced a booklet entitled "American National Standard for Manually Propelled Mobile Ladder Stands and Scaffolds" which provided in pertinent part: "*The maximum work level height* shall not exceed four times the minimum or least base dimension of any mobile ladder stand or scaffold. Where the basic mobile unit does not meet this requirement, outrigger frames shall be employed to achieve this least base dimension or provisions shall be made to guy or brace the unit against tipping." (Emphasis supplied.) According to defendants, "maximum work level height" refers to the height of the possible fall from the working platform. In defendants' view, because plaintiff could have fallen over the rotunda railing onto the floor sixty to seventy feet below, plaintiff misused the scaffold when he failed to properly attach the outriggers. Plaintiff, on the other hand, claimed that "maximum work level height" refers only to the height of the working platform above the floor on which the scaffold rests. Thus, in plaintiff's view, utilization of the outriggers in this case was unnecessary.

▮ Defendants should have reasonably anticipated that the phrase "maximum work level height" could be construed to refer to the height of the working platform above the floor on which the scaffold rests. Therefore, plaintiff's failure to properly utilize the outriggers where the single level platform was approximately four to five feet above the floor does not constitute use of the scaffold in a manner which could not reasonably have been anticipated by defendants. Because there was insufficient evidence to support the defense of misuse, we reverse and return this case to the Court of Appeals with directions to remand to the district court for a new trial.

**5.** Defendants' expert witness testified that the outriggers were not necessary where only one

ROVIRA, J., dissents.

KIRSHBAUM, J., does not participate.

ROVIRA, Justice, dissenting:

I believe that the Court of Appeals' opinion in *Jackson v. Harsco Corp.*, 653 P.2d 407 (Colo.App.1982), is correct as to the issues of assumption of the risk and misuse. For the reasons set out in that opinion I respectfully dissent.