Jerry A. GUNDERSON, Respondent,

v.

SANI–KEM CORPORATION, Appellant.

No. WD 34584.

Missouri Court of Appeals,
Western District.

July 24, 1984.

Kenneth O. Smith and Sharon K. Weedin, Kansas City, for appellant; Knipmeyer, McCann, Fish & Smith, Kansas City, of counsel.

Steven K. Wickersham and William R. Merryman, Kansas City, of counsel; Wickersham & Merryman, Kansas City, of counsel.

Before PRITCHARD, P.J., and SOMER-VILLE and KENNEDY, JJ.

PRITCHARD, Presiding Judge.

Plaintiff was injured on January 11, 1980, when he got his hands caught in a continuous conveyor system which was used by the Fairmont Foods Corporation to convey dairy products, which were unloaded from trucks, into its plant at 3805 Van Brunt Boulevard, Kansas City, Missouri. Plaintiff's theory was that lubrication equipment, installed by defendant upon the existing conveyor system, was in a defective condition unreasonably dangerous when put to a reasonably anticipated use, an action in strict liability in tort. The jury returned a verdict for plaintiff in the amount of $75,000, upon which judgment was entered.

Defendant asserts that the trial court erred in overruling its motion for judgment N.O.V. because there was no evidence that it designed, manufactured or sold the conveyor system, and that there was no evidence that a spray nozzle, which was the only lubrication equipment supplied by defendant, was defective. Defendant also asserts that plaintiff was contributorily at fault as a matter of law.

The conveyor system runs in a north-south direction upon a loading-unloading dock on the east side of Fairmont's plant. The system is a "drag chain" conveyor built into the dock floor. It consists of two endless chains running parallel to each other. At the north end of the dock in a pit area below the dock level is an electric motor and sprocket wheels which drive the metal link chain along the dock. At the south end of the chain there is an idler pulley, without power, which serves to turn the chain around so that it will return to the north end. The parallel chains travel in metal tracks which are built into the dock. A lubrication must be used on the system, where metal is contacting metal as the chain moves along, to prevent constant breakdown. Because Fairmont is a dairy, processing food products, oil is not used as a lubricant, but a soapy substance is supplied through a tubed lubrication system on a continuous basis.

The lubrication system consists of a 55 gallon drum, a lubrication "pump" board which mixes the lubricant with water, and hollow plastic tubing connected with ferrules and nuts which conveys the mixed lubricant to the various points of lubrica-

tion. The system is controlled by a solenoid valve which turns on the lubrication when the conveyor system is on, and turns it off when the system is shut down. The conveyor system could not be in an off position when the lubrication system is functioning.

About one month prior to plaintiff's injury, James Knight was employed by Fairmont as its chief engineer. He, as a first project, inspected the dock conveyor system, and determined that it was not suitable in that it was using excessive lubrication, and the lubrication which was being used would freeze on occasion, and thus block it from reaching the conveyor system. He contacted Wayne Bradshaw, defendant's representative, to see if he could solve existent problems.

Shortly after Knight contacted him, Bradshaw visited the Fairmont plant and inspected the entire outside lubrication system, at which time he was seeking to solve its problems. Bradshaw then discussed with Knight about defendant becoming a supplier of chemical products in the plant, and what defendant could do to upgrade the system, inside and out. "Q. What did you indicate that you could do for him? A. Well, he had a product that was being supplied by another company at that time that was an inferior product. Also the price seemed to be out of line and naturally my job was to give him a good product at a good price and make him a customer of ours." Thereafter, Knight, on behalf of Fairmont, made a contract with defendant whereby it was "[G]oing to furnish us some Polar Lube and redesign our system in an effort to try to stop the freezing and excessive consumption of the lubricant." Knight testified that defendant was performing its functions independently with no real direction from Fairmont, and he never prohibited it from doing anything it requested.

Defendant's Bradshaw and Ray Savage performed modifications of the lubrication system and supplied Fairmont with its lubricant. Prior to that time Fairmont was using a lubricant which was sprayed upon the "drag chain" at different points through a pinched copper tubing. One of these copper tubings was placed at the south end of the drag chain where the chain was travelling away from the idler pulley [and thus to clean the tubing, one's hands would not be pulled into the idler pulley, which reversed the direction of the chain]. In the modification, defendant replaced the pinched-down copper tubing with a system of spray nozzles which were hooked onto a strap which was then connected to brackets placed around I-beams which went across the pit area. The straps were bent up underneath the dock area so that they were inside the two chains and the nozzles were spraying onto the sides of the chains underneath the pit and in close proximity to the end idler pulley. The nozzle at the south end was placed in a position that below it the chains were going into the idler pulley, rather than away from it, which was the prior location of the previous pinched copper tubing.

At the time of his injury, plaintiff had been a maintenance engineer for 2½ years. Prior to that time, he had no previous job experience involving repair of machinery. Upon his transfer to Fairmont's department of maintenance engineering, he was made a trainee working with another maintenance engineer from whom plaintiff familiarized himself with the repair of machines by watching others do the same or similar tasks.

Plaintiff had come on duty at 7:00 a.m., January 11, 1980, and started inspecting the various lubrication lines on the conveyor system to see if they were operating. He determined that several were not operating and he repaired them before going to the east dock drag chain conveyor. When he arrived there, he proceeded to check the spray nozzles. This procedure involved unbolting the whole bracket, pulling it down and cleaning it out by blowing it out, then putting it back together. He did not turn off the machine while doing this because there were trucks in the process of being loaded. He then went to the south end of the line where he could see that it was

mushy and starting to freeze up—there was no spray coming from the nozzles. He opened the line by using the solenoid [which must be on for the chain to run and the lubricant to flow in unison]. He took out a five foot section and blew it out of mushy ice and soap, then knowing it was clean. He proceeded down the line clearing it in the same manner by sections. When he got to the place where his hands were caught, he had turned off the lubricant (referred to as soap) by use of a hand valve, and proceeded to put the collar with the nozzle tip (which screws on) back on, and as he was turning the collar, it slipped and he tried to catch it before it fell. His left hand dropped down 6 or 7 inches and hit the chain which drew it into the conveyor idler arm pulley. He tried to extricate his left hand with his right, but it also got caught in the idler arm pulley, and he lost all the digits on his left hand and the index and middle finger on his right hand.

With respect to defendant's contention that it is not liable because it did not design, manufacture or sell the conveyor system, that, of course, is true. That is not the issue, but the issue is whether it modified an existing lubrication system in a defective manner—by placing spray nozzles in a position below the chain, and in a position that the one which plaintiff was trying to clean was above the chain which at that point was travelling *toward* the idler arm pulley which caught plaintiff's hands. The crimped tubing, previously used, was on the top chain which was travelling away from the idler arm pulley. The placement of the nozzles by defendant's employee, Savage, is the defective condition unreasonably dangerous which plaintiff asserts caused his injury.

A further part of defendant's first point is that it did not "sell" the modification nozzles. At 72 C.J.S. Supp., Products Liability, § 40, p. 60, it is said, "The word 'sells' within the Restatement rule [Rest.2d Torts, § 402A] of strict liability is merely descriptive, and the test for determining the applicability of the rule is not the sale of the product, but rather the placing thereof in commerce. Thus, liability is imposed on all those in the chain of placing a defective product in the stream of commerce, and the product need not be actually sold if it has been injected in the stream of commerce by other means. Under the stream-of-commerce approach to strict liability no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability; it is the defendant's *participatory connection, for his personal profit or other benefit,* with the injury-producing product and *with the enterprise that created consumer demand for and reliance upon the product* which calls for the imposition of strict liability. * * *." [Brackets and italics added.] See also the there cited cases for the quoted principle, *Link v. Sun Oil Company,* 160 Ind.App. 310, 312 N.E.2d 126, 130[7, 8] (1974); *Allison Steel Mfg. Co. v. Superior Court, Etc.,* 20 Ariz. App. 185, 511 P.2d 198, 202, 203[7–9] (1973); *Kasel v. Remington Arms Company,* 24 Cal.App.3d 711, 101 Cal.Rptr. 314, 323[7] (1972); *Verge v. Ford Motor Co.,* et al., 581 F.2d 384 (3rd Cir.1978), holding that Ford, the manufacturer, was not liable for failure to include a backup warning device on a garbage truck, that being the responsibility of the Leach Company, which installed the garbage compactor unit.

■ Here, the evidence shows and the jury could find that defendant was not just a casual supplier of lubrication equipment to firms such as Fairmont, and that the design of the modification and the furnishing of spray nozzles on the conveyor system was not an isolated incident. Cf. *Dewberry v. LaFollette,* 598 P.2d 241, 242[1–3] (Okla.1979). Rather, the jury could find that defendant, through Bradshaw, proposed to Fairmont's Knight, to alter the lubrication system in order to save lubricant. The installation of the modification was left to defendant, including the location of the nozzle replacements. The defendant's proposals were for the purpose of gaining Fairmont's business for lubrication supplies, and to eliminate competition.

Defendant had previously been engaged in the installation of between 50 and 60 complete lubrication systems, and had modified from 100 to 125 existing systems. Savage was defendant's manufacturer of lubrication systems. Defendant's president acknowledged that it had represented to customers that it had engineering capabilities, and that it is known as a problem solver throughout the Midwest. Under all of the evidence, the plaintiff made a submissible case that defendant was engaged, for its profit and benefit, in the modification of existing lubrication systems, and that it placed the spray nozzle which plaintiff was attempting to clean in a place where it was unreasonably dangerous in that it was in a (changed) position where the chain was travelling toward the idler arm pulley which caught plaintiff's hand. The jury could conclude that in view of defendant's activity in previous complete installations, and modifications of existing systems, the *manufacture* and *installation* of the present nozzles, including their placement, was not a casual or isolated transaction which would not bring the doctrine of strict liability into play mentioned in the *Dewberry* case, supra, page 242 (with footnoted cases).

Defendant's cited cases have been considered and it is determined that none are in point on the facts of this case, where defendant manufactured, modified and installed the lubrication system, independent of any basic design by the original manufacturer of the whole conveyor system. *Hales v. Green Colonial, Inc.*, 490 F.2d 1015 (8th Cir.1974), involved a claim of indemnity by a manufacturer against an installer of a defective heater, held not to lie [but see the subsequent case of *Missouri Pac. R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466 (Mo. banc 1978), decided after the *Hales* case, supra, holding that concurrent joint tort-feasors may be liable for contribution in proportion to their relative fault]. *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188 (8th Cir.1981), held that a manufacturer was liable for a defective bit on a "piggyback" trailer, and subsequent changes or alterations in the product do not

relieve the *manufacturer* of strict liability if the changes were foreseeable and the changes did not unforeseeably render the product unsafe. *Leonard v. Albany Machine and Supply Company*, 339 So.2d 458 (La.App.1976), held that the *original* manufacturer was under no duty to supply shields against flying cut-off lumber ends, where it had nothing to do with the design of the lumber mill, which undertook on itself to provide shields. *Moon v. Winger Boss Company, Inc.*, 205 Neb. 292, 287 N.W.2d 430 (1980), held that an independent contractor who manufactured a system of automatic beef processing equipment, to the processor's specifications, but who was refused details of the proposed layout of the completed system, and who was denied admittance to the plant to observe the contemplated placement of component parts, and who was not permitted to inspect the assembled system, was not liable to an employee who became entangled in the machinery, where there was no evidence that the plans submitted to the independent contractor by the beef processor, were so obviously, patently and glaringly dangerous that a manufacturer exercising ordinary care would not follow them. [Contrast the facts here, where defendant went in and modified the lubrication equipment without interference from Fairmont.] *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978), held that where Union Supply modified the design drawing submitted by a sugar beet refinery by substituting another manufacturer's components and allegedly adding mechanical engineering specifications necessary for manufacture, it was strictly liable to the injured plaintiff who got his arm caught in an unguarded "nip joint" on a sugar beet conveyor system. The *Pust* case tends to support plaintiff's position here. *Hoffman v. Simplot Aviation, Inc.*, 97 Idaho 32, 539 P.2d 584 (1975), held that the rule of strict liability in tort does not apply to cases involving personal services, but the jury should have been instructed on the theory of implied warranty to perform services (repair of an airplane) in a workmanlike

manner. *Pepsi Cola Bottling Co. v. Superior Burner Serv. Co.*, 427 P.2d 833 (Alaska 1967), held that strict liability has not been imposed upon those who have agreed to furnish labor or services; that appellant could not submit a cause of action in implied warranty in addition to one in tort, the standard of care being the same in both causes of action, but that appellant was entitled to a new trial for failure to give a limiting instruction on contributory negligence.

Under the facts of this case, defendant's argument that plaintiff should have pursued the remedy of strict liability against the original designer of the conveyor system is untenable. That designer did not modify the system by repositioning the lubrication nozzles in a dangerous location-where the chain travels toward the close idler arm pulley. Nor does its argument that plaintiff should have been limited to a negligence theory, which was not submitted but was abandoned, have merit. Point I is overruled.

Defendant's second point is that its motion for judgment N.O.V. should have been sustained because plaintiff was contributorily at fault as a matter of law. It argues that plaintiff voluntarily and unreasonably exposed himself to the danger (of the moving chain, and the idler arm pulley), and cites and relies on *Tomicich v. Western-Knapp Engineering. Company*, 423 F.2d 410 (9th Cir.1970). That case may be distinguished. There, Tomicich was attempting to scrape mud from a sheave of a running conveyor system by inserting a piece of angle iron into it, whereupon his arm was amputated. The opinion notes that there were three ways to clean the sheave: to scrape the sheave while the conveyor was running; to turn off the machine and scrape the sheave; and to use two men, one to stand at the on-off switch and operate it while the other cleaned the sheave when the machine was off, then to turn it back on to see if the cleaning had been successful. Tomicich acknowledged that there was danger in the moving equipment, from which safety shields had been removed, and he had worked around machinery for many years. The court noted that his acts were deliberate, and he did not claim surprise at any hidden defect in the conveyor, and that Montana, the law of which applied, might recognize the old rule that manufacturers are under no duty to guard against or warn of obvious dangers. Under undisputed facts there, the court held that Tomicich voluntarily exposed himself to a known danger of the machine.

■ In this case, although there were switches available some distance away (on the second floor) from where plaintiff was cleaning the lubrication systems, and red tags were available to warn others not to activate the switches when the tags were in place, there was testimony from plaintiff's supervisor, Knight, that workmen did not always turn off the machines before cleaning the lubrication nozzles. "A. Probably because they think they can do it without being injured." Knight felt that what the workers were doing was reasonable when he observed it, and that conclusion is buttressed by the testimony of plaintiff's co-worker, McCann. He testified that when he worked on the lubrication lines or spray nozzles, he did not usually turn off the machines for these reasons: When it is shut off, there is no pressure in the soap system to clean out with it (the chain drive and the flowage of lubricant run at the same time through a connecting solenoid switch), so after it is clean one cannot direct the sprays back on the chain; the usage of the chain would be disrupted causing down time at the plant; and the chain would have a tendency to dry out or freeze.

Although Fairmont had general safety rules for workers to keep hands away from moving machinery, and to shut off the machine before clearing jammed materials, plaintiff could not remember ever having received a copy of them, or seeing them posted in the plant. Knight testified that many of the rules were consistently not followed, including that of turning off the machines before clearing them. All of the foregoing evidence was for the jury to eval-

uate on the question of whether plaintiff was making a reasonable use of the conveyor at the time of his injury.

There is another factor not present in the Tomicich case. Plaintiff had an unforeseen, unanticipated event take place-that of dropping the nozzle tip as he was trying to replace it. His reflex was to try to catch it, and thus his left hand contacted the chain. Also, the "open and obvious" danger rule was commented upon by the *Pust* court, supra, 583 P.2d, p. 284, as having been frequently attacked by the courts and scholars, and the court held that the alleged patent nature of a defect is not in and of itself a defense to strict liability, and the use of that defense would be applying an assumption of risk defense as a matter of law. See also *McGowne v. Challenge-Cooke Bros., Inc.*, 672 F.2d 652 (8th Cir. 1982), where the court said, applying Missouri law, that an obvious or apparent danger is pertinent to the issue of contributory fault, but does not alone constitute a defense to a submissible case of strict liability. The trial court properly submitted the issue of plaintiff's contributory fault to the jury by Instruction No. 7, and did not err in declining to sustain defendant's motion for judgment N.O.V. on that issue. Point II is overruled.

The judgment is affirmed.

All concur.